**Marshall SPIEGEL, Plaintiff,**

v.

**Det. Joseph CORTESE and Sgt. Frank Kajari, Defendants.**

**No. 95 C 3697.**

United States District Court, N.D. Illinois.

June 3, 1997.

---

David Carl Thomas, G. Flint Taylor, Jr., Chicago, IL, for plaintiff.

Irene Schild Caminer, Sharon Baldwin, Margaret Ann Carey, Patricia Jo Kendall, Susan S. Sher, James Patrick McCarthy, Alec McAusland, Gregory J. Wojkowski, Yvonne Spradley La Grone, City of Chicago, Law Department, Corporation Counsel, for defendants.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Marshall Spiegel originally brought this action against the City of Chicago, five Chicago police officers and an employee of the city's Department of Aging, alleging that he was unlawfully arrested and confined in violation of the Fourth and Fourteenth Amendments. Ruling on the defendants' motion to dismiss, this Court eliminated all but one count and two defendants. Remaining is Spiegel's claim that defendants Detective Joseph Cortese and Sergeant Frank Kajari violated his constitutional rights under 42 U.S.C. § 1983 by arresting

him without probable cause. Cortese and Kajari's motion for summary judgment on this issue is presently before the Court.

## RELEVANT FACTS[1]

We start by presenting the facts, drawing all reasonable inferences in favor of Spiegel, the non-moving party. *See Wolf v. Buss America, Inc.,* 77 F.3d 914, 918 (7th Cir. 1996). It is an unfortunate reality that the genesis of this litigation is a noise dispute between Spiegel and his wife, Carol, and their neighbors, Loren Cherny and Min Bobin. Cherny and Bobin lived directly above the Spiegels in the Hollywood Towers Condominium complex. (Defs.' Facts ¶ 1). On May 29, 1993, the Spiegels were disturbed by noise coming from Cherny and Bobin's residence and went upstairs to complain. (Pl.'s Add'l Facts ¶ 1). Carol began pounding on Cherny and Bobin's door; Spiegel stood nearby, holding his young son. (Cherny Dep. at 38–39; Spiegel Dep. at 12, 17). Cherny and Bobin came out of their condo and into the hallway, inadvertently locking the door behind them. (Cherny Dep. at 43). A heated argument ensued, prompted, each couple claims, by the others' barrage of insults. (Spiegel Dep. at 6–7, 19, 32; Cherny Dep. at 41–42). Hanan Hughes, another Hollywood Towers resident, peered into the hallway from her doorway—she confirms the argumentative exchange. (Hughes Dep. at 7–8).

At some point, it appears that the altercation became physical. Spiegel testifies that Cherny rushed toward him and pushed him with both hands. (Spiegel Dep. at 26, 33). Cherny, however, claims that Spiegel, still holding his son, backed Cherny into the corner outside of his locked door and kneed him in the inner thigh. (Cherny Dep. at 42–43). According to Hughes, who was still watching from her doorway, Cherny did shove Spiegel, but the shove was in response to Spiegel's advance toward him. (Hughes Dep. at 8). She denies seeing Spiegel kick Cherny, but did hear Cherny exclaim that Spiegel had kicked him and Spiegel immediately deny having done so. (*Id.* at 23–24). At last, Eugene Simms, the doorman at Hollywood, arrived at the behest of Hughs' husband and persuaded the Spiegels to return home. (*Id.* at 6, 8, 38). This incident was the culmination of several noise-related disputes between the couples.

Two days later, on May 31, Spiegel went to the Chicago Police Department and filed a police report. (Defs.' Facts ¶ 2). Spiegel alleged in the report that he had been shoved by both Cherny and Bobin, and listed his wife as a witness. (*Id.* ¶ 2; Pl.'s Add'l Facts ¶¶ 44–45). He did not file a complaint against Cherny or Bobin at that time.[2] (Defs.' Facts ¶ 6). On June 21, 1993, Spiegel

---

1. The facts are derived from statements that the parties filed with this Court under the Northern District of Illinois' Local General Rule 12(M)–(N). Rule 12(M)(3) requires a party moving for summary judgment to file a "statement of material facts as to which the moving party contends there is no genuine issue." The movant's statement must contain "specific references to affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." Rule 12(M)(3). Cortese and Kajari's statement is cited as "Defs.' Facts ¶ —." Similarly, Rule 12(N)(3)(a) requires the non-moving party to file a concise response to the movants' statement including, in the case of any disagreement, specific references to supporting materials. Spiegel's response is cited as "Pl.'s Facts ¶ —." Rule 12(N)(3)(b) authorizes the non-moving party to submit a statement of "additional facts that require the denial of summary judgment"; under Rule 12(M), the moving party may then submit a reply to the non-moving party's additional facts. Spiegel's statement of additional facts is cited as "Pl's Add'l Facts ¶ —" and the defendants' reply is cited as "Defs.' Resp. Add'l Facts ¶ —." All properly submitted material facts set forth in either party's statement (i.e., Defs.' Facts or Pl.'s Add'l Facts) are deemed admitted unless properly controverted. See Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921–22 (7th Cir.1994); *Stewart v. McGinnis,* 5 F.3d 1031 (7th Cir.1993). Moreover, the mere denial of a particular fact without specific references to the "affidavits, parts of the record, and other supporting materials" is insufficient, and, where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted. *Flaherty,* 31 F.3d at 453.

2. He mentioned in the police report that Cherny was sixty-one years old and that Bobin was fifty-seven years old, but the couple's ages were actually seventy-four and seventy-three, respectively. (Defs' Facts ¶ 4). Spiegel was thirty-six years old at the time. (*Id.* ¶ 3).

returned to the police station to file criminal charges. (*Id.* ¶ 7). He spoke with Defendant Sergeant Kajari about the May 29th incident, telling Kajari that two neighbors had battered him while he was holding his child. (Id.) Spiegel asked Kajari whether Cherny and Bobin had filed a report against him. (*Id.* ¶ 9). After checking the computer for the information, Kajari told Spiegel that they had not, and explained that, if Spiegel wished to file charges, he would need to return another day because the warrant desk was closed. (*Id.* ¶¶ 8, 10). Spiegel came back on June 23 and swore out a summons and complaint against Cherny and Bobin. (*Id.* ¶ 11). The warrant clerk declined to issue the summons; instead, he referred the matter for further investigation. (Pl.'s Add'l Facts ¶ 37).

Cherny and Bobin also went to the police station on June 23, 1993 to file a police report concerning the May 29th incident. (*Id.* ¶ 12). On June 25, 1993, Kajari assigned defendant Detective Cortese to investigate Cherny and Bobin's report. (Cortese Dep. at 44 & Defs.' Ex. E). Kajari thereafter maintained overall responsibility for supervising the investigation, but does not remember discussing the investigation with Cortese after assigning it to him. (Pl.'s Add'l Facts; Kajari Dep. at 18).

Cortese interviewed Cherny and Bobin on June 25th. (Pl.'s Add'l Facts ¶ 39). During the interview, Cherny and Bobin described the May 29th incident from their perspective.[3] They told Cortese the following: at approximately 6:20 p.m. on May 29, 1993, while Cherny and Bobin were having dinner, they heard loud pounding on their door. (Cherny Dep. at 38–39). When they opened the door, they discovered Spiegel and Carol in the hallway. (*Id.* at 39). Carol began screaming that she had been disturbed by the continuous noise emanating from Cherny and Bobin's unit. (*Id.* at 39–40). Mean-

while, Spiegel, holding his child, moved within eight inches of Cherny's face and backed Cherny into the corner outside of his door. (*Id.* at 42). Spiegel repeatedly said, "Come on you old fart, hit me; hit me!" (*Id.*) Spiegel then raised his knee and struck Cherny in the inner thigh. (Cherny Dep. at 43; Hennelly Dep. at 45–46). Bobin, after having been insulted by Carol, tried to get back into her condo. (Cherny Dep. at 42–43). Because the door was locked, Bobin could not get in. (*Id.* at 43). Bobin states she may have informed Cortese that, at this point, Spiegel pushed her and she reacted by pushing him back. (Bobin Dep. at 22, 23, 98). Doorman Simms then arrived, prompting Spiegel and Carol to return to their condo. (Cherny Dep. at 44). Cherny told Cortese that another witness, whom Cortese later found out was Hanan Hughes, had been present for part of the incident. (Cortese Dep. at 111).

In addition to interviewing Cherny and Bobin for one hour on the 25th, *see* Pl.'s Add'l Facts ¶ 86, Cortese reviewed a number of documents. From these he learned that the May 29, 1993 incident was not an isolated event, but rather was the culmination of a series of disputes between the Spiegels and Cherny and Bobin. Cortese read Spiegel's May 31, 1993 police report, which alleged that he and Cherny and Bobin had an "ongoing verbal dispute," and that during the May 29th argument, Cherny and Bobin both shoved him—as witnessed by Spiegel's wife. (Pl's Add'l Facts ¶ 44). The report also related that Cherny and Bobin had previously threatened to harm Spiegel physically. (*Id.* ¶ 45). Corroborating the parties' acrimonious relationship were documents provided by Cherny: Cherny's June 23, 1993 battery case report, two letters from Spiegel to the Hollywood Towers Condominium Association (the "HTCA"), a letter from the HTCA to Cherny and Bobin, and one or two resident incident reports filled out by Bobin.[4]

---

**3.** Cherny explained that he and Bobin waited for nearly a month to file charges against Spiegel because they had no experience with the criminal justice system—instead, they pursued informal remedies through the Condominium Association. (Cherny Dep. at 48). It was not until several weeks after the May 29th incident, when an employee of the City of Chicago's Department

of Aging advised Cherny and Bobin as to their legal rights, that they decided to file charges. (*Id.* at 50).

**4.** Cherny also told Cortese that Spiegel had placed in Cherny and Bobin's mailbox a number of antagonistic notes complaining about other alleged noise-related disturbances. (Cherny Dep.

The HTCA letters arose from informal action that the Association took, beginning in February 1993, to address the Spiegel–Cherny–Bobin noise disputes. Cherny told Cortese that the Spiegels had started things by complaining to the HTCA that Cherny and Bobin were making an unreasonable amount of noise. (Cherny Dep. at 28, 30). The HTCA set a hearing on this matter and gave notice to the Spiegels. (Defs.' Ex. L). In one of the letters Cherny gave to Cortese, dated February 3, 1993, Spiegel informed the HTCA that he needed more time to obtain counsel. (Defs.' Facts ¶ 35; Defs.' Ex. L). The second letter, dated February 11, 1993, relayed the HTCA's decision resolving the hearing in Cherny and Bobin's favor. (Defs.' Facts ¶ 34; Defs.' Ex. K). The third letter, dated June 2, 1993, was signed by Spiegel and addressed to the HTC property manager, challenging the notice that HTCA had provided Spiegel for its upcoming disciplinary hearing against him. (Defs.' Facts ¶ 39; Defs.' Ex. M).

Cherny and Bobin also furnished Cortese with copies of either one or two residence incident reports filed with the HTCA describing the May 29th altercation. One report bears two dates—June 1, 1993 and June 17, 1993. (Defs.' Facts ¶ 15). The full document contains a two-page summary of May 29th's events, alleging on page two that Spiegel "kicked" Cherny. But Cortese testified that his file contains only the first page—which does not refer to any physical contact between Spiegel and Cherny. (*Id.*; Cortese Dep. at 78, Ex. 4; Pl.'s Facts ¶ 15). Before completing the report dated both June 1, 1993 and June 17, 1993, Bobin had filled out another two-page resident incident report dated only June 1, 1993. (Defs.' Facts ¶ 16; Defs.' Ex. P). While this report also describes the May 29 incident, it does not mention that Spiegel kicked or kneed Cherny. (Defs.' Ex. P). Although the parties suggest that Cortese may have seen this document, it remains unclear whether it was actually presented to him. (Defs.' Facts ¶ 16; Pl.'s Facts ¶ 16). Cherny says that he "possibly" had shown it to Cortese. (Cherny Dep. at 141).

Cortese, however, denies having been given this document. (Cortese Dep. at 68).

Nonetheless, Cherny claims he supplied Cortese with evidence of Spiegel's battery during the June 25th interview by showing him a photograph of his bruised right thigh, which he claims was taken on or about June 1, 1993. (Defs.' Facts ¶¶ 19–20). As further proof, Cherny testified that he lowered his pants and showed Cortese and Detective Hennelly, Cortese's partner, the remnants of a bruise that Cherny attributed to Spiegel. (*Id.* ¶ 32). Cortese could not tell how old the bruise was, but Hennelly thought it was between two-and-a-half and four weeks old. (Cortese Dep. at 106; Hennelly Dep. at 63). Hennelly also testified that the bruise in the 6/1/93 picture appeared to be basically the same age as the actual bruise Cherny showed him on June 25th. (Pl.'s Add'l Facts ¶ 77).

On the same day he interviewed Cherny and Bobin, Cortese called Spiegel's home to speak with him about the couple's allegations. (Defs.' Facts ¶ 41; Cortese Dep. at 126). Spiegel's wife answered the telephone. (Pl.'s Add'l Facts ¶ 86). Although Spiegel had listed her as a witness on his May 31 police report, Cortese did not question Carol about the incident. (*Id.*) Cortese simply told Carol that an allegation of wrongdoing was pending against Spiegel and that Spiegel would be arrested at his home if he did not call the police station. (*Id.* ¶¶ 86, 88).

When Spiegel returned Cortese's phone call, Cortese told Spiegel about the charges against him and instructed him to come to the police station with bond money. (Defs.' Facts ¶ 42; Pl.'s Add'l Facts ¶ 93). Spiegel responded that he had filed similar charges against Cherny and Bobin two days earlier. He explained that Cherny and Bobin were the ones actually guilty of battery, and that there were witnesses who would corroborate Spiegel's story. He mentioned the police report he filed against Cherny and Bobin in May and offered to fax Cortese all pertinent documents. Finally, he told Cortese that Cherny and Bobin's charges were fabricated,

at 80–82). He did not show Cortese the notes. Cherny said that the HTCA eventually directed Spiegel to make all future complaints to the building office and not to Cherny or Bobin. (*Id.* at 203).

filed in retaliation for the summons and complaint that Spiegel had sworn out against Cherny and Bobin two days before. (Defs.' Facts ¶ 43; Pls.' Add'l Facts ¶¶ 94, 96–98). Instead of following up on Spiegel's statements, Cortese read him his rights and told him to get a lawyer. (Pl.'s Add'l Facts ¶ 93; Spiegel Dep. at 121–22). Spiegel says that he then asked to speak to Kajari, to whom he repeated this information. (Defs.' Facts ¶ 99; Spiegel Dep. at 239). Kajari, however, refused to interfere in Cortese's investigation. *Id.* In his deposition, Kajari denies having spoken with Spiegel. (Kajari Dep. at 50).

Later that same day, Spiegel's attorney called Cortese and informed him that Spiegel would not be providing any more information about the incident. (Pl.'s Add'l Facts ¶ 110; Cortese Dep. at 137, 139). Cortese immediately halted his investigation. (Cortese Dep. at 137, 139). He had not spoken to Hanan Hughes or Carol Spiegel about what they had seen on May 29th, despite having been given their names as potential witnesses. He did not request the names or phone numbers of any other witnesses who might corroborate Spiegel's story. Nor did Cortese talk to anyone from the Hollywood Towers Condominium Association or request documentation beyond what he reviewed during Cherny and Bobin's interview. Following his lawyer's phone call to Cortese, Spiegel went with his lawyer to the police station, where he was arrested for battery.[5] (Pl.'s Add'l Facts ¶ 115). He was subsequently tried and acquitted of all charges. (*Id.* ¶ 118).

Spiegel brought suit against the City of Chicago, five police officers, and an employee of the Department of Aging, alleging that the police officers failed to adequately investigate Cherny and Bobin's allegations before arresting him. The defendants moved for dismissal. This Court granted that motion in part, dismissing from the suit all defendants except Cortese and Kajari. With respect to Cortese and Kajari, the Court held that Spiegel's allegations stated a claim for wrongful arrest under 42 U.S.C. § 1983. *Spiegel v. City of Chicago,* 920 F.Supp. 891, 898

(N.D.Ill.1996). The facts as alleged demonstrated that the officers were aware of information that undermined the reliability of Cherny's allegations that Spiegel battered him on May 29th. *Id.* We found that "[t]he timing of Cherny's charge, [Spiegel's] allegation of retribution and the availability of independent witnesses would have created doubt in a reasonable officer to warrant a further investigation." *Id.* Therefore, the complaint, taken at face value, revealed the absence of constitutionally required probable cause for Spiegel's arrest. *Id.* We also went on to reject, at the dismissal stage, the officers' defense that qualified immunity insulated them from suit. *Id.*

Cortese and Kajari now move for summary judgment on Spiegel's remaining claim for wrongful arrest. Cortese maintains that the record shows his investigation was sufficient to uncover probable cause for Spiegel's arrest, while Kajari argues that he is not liable because he did not participate in the arrest. Both officers urge that, should the Court deny summary judgment on probable cause, the defense of qualified immunity still protects them from suit because they reasonably believed that they had probable cause to arrest Spiegel. After considering the parties' arguments, we deny the defendants' motion for summary judgment.

## LEGAL STANDARDS

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.1987), and draw all inferences in the nonmovant's favor. *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable,

**5.** According to Cortese, an arrestee has the right to prove himself "not guilty"; he testified that

had Spiegel done so, Cortese would not have arrested him. (Cortese Dep. at 132–34).

or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Flip Side Prods., Inc. v. Jam Prods., Ltd.,* 843 F.2d 1024, 1032 (7th Cir.1988). In determining whether a genuine issue exists, the court "must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513. The court's sole function is to ascertain whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Id.* at 255, 106 S.Ct. at 2513–14.

## ANALYSIS

The first argument defendants propound in support of summary judgment is that Spiegel's arrest was lawful because it was supported by probable cause. Reduced to its essentials, defendants' claim is that Cortese acted upon reliable information from Cherny and Bobin and took account of all the evidence readily available to him. Under these circumstances, they argue, Cortese cannot be held liable for wrongful arrest under § 1983.

### I. Detective Cortese—Probable Cause

▮ The Fourth Amendment, enforced against state officials through § 1983, prohibits police officers from arresting a suspect without probable cause.[6] *United States v. Trigg,* 878 F.2d 1037, 1041 (7th Cir.1989). In evaluating whether a police officer had probable cause to arrest a suspect, the court considers the facts and circumstances of which the officer was aware of at the time of the arrest. *Jones v. Watson,* 106 F.3d 774, 779 (7th Cir.1997). The probable cause assessment varies with the need for prompt action and the quality of available information. *Maxwell v. Indianapolis,* 998 F.2d 431, 434 (7th Cir.1993) (citations omitted). With respect to the latter, the key question is whether the information relied upon was rea-

sonably trustworthy " 'to warrant a prudent man in believing' that the arrestee" had committed a crime. *Sheik–Abdi v. McClellan,* 37 F.3d 1240, 1246 (7th Cir.1994) (citations omitted). A police officer is by no means expected to conduct a trial-type inquiry before making this determination; in fact, a statement by the victim of the crime will usually suffice. *Gramenos v. Jewel Cos.,* 797 F.2d 432, 439 (7th Cir.1986). However, if something about the victim or his report would lead a reasonable officer to question the victim's reliability, then the officer must proceed with a more thorough investigation before making an arrest. *Hebron v. Touhy,* 18 F.3d 421, 422–23 (7th Cir.1994).

▮ In a § 1983 damages suit such as the one before us, the question of whether a police officer had probable cause to make an arrest is typically a jury question:

> [I]f the question of probable cause arises in a damages suit, it is a proper issue for the jury if there is room for a difference of opinion concerning the facts of the reasonable inferences to be drawn from them. Accordingly, a conclusion that probable cause existed as a matter of law is appropriate only when no reasonable jury could find that the officers did not have probable cause to arrest [the defendant].

*Maxwell,* 998 F.2d at 434.

Based on these standards, Spiegel claims that Cortese lacked probable cause to arrest him because his investigation was woefully inadequate. Knowing about the history of disputes between the Spiegels and Cherny and Bobin, as well as the police report Spiegel filed against the couple nearly a month before they decided to press charges against Spiegel, a reasonable officer would allegedly have suspected that Cherny and Bobin bore a grudge against Spiegel and questioned whether the information they supplied was trustworthy. Moreover, Spiegel claims, the inconsistency between Cherny and Bobin's story and the documents they gave Cortese,

---

**6.** Section 1983 provides that any person who "subjects ... any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at

law." 42 U.S.C. § 1983. The Fourth Amendment to the United States Constitution states that a person shall not be arrested except upon a finding of probable cause.

as well as the appearance of Cherny's bruise—which seemed not to have aged at all since it was photographed three weeks earlier—would likewise have raised doubts about the complainants' credibility. Rather than jumping the gun to arrest Spiegel the same day based on the word of such unreliable complainants, a reasonable officer would have performed a more thorough investigation—which would include questioning the potential witnesses whose names he possessed. At the very least, Spiegel argues, these facts present a jury question as to probable cause.

In response, Cortese insists that he had probable cause to arrest Spiegel. First, he claims that the information, documents, and photographs obtained from Cherny and Bobin, together with evidence of Spiegel's guilty conscience, support a finding of probable cause.[7] Second, he maintains that the evidence of any grudge that Cherny and Bobin bore against Spiegel was insufficient to call the reliability of their information into question. Third, he argues that he had no duty to search out witnesses from Hollywood Towers because they were not immediately available to him. Finally, Cortese claims that the evidence considered in hindsight does not exculpate Spiegel; therefore, it does not "vitiate" Cortese's original finding of probable cause.

### A. Evidence Undermining Cherny and Bobin's Reliability

We begin by addressing the parties' arguments about the significance of a possible grudge on Cherny's and Bobin's part. In *Gramenos v. Jewel Cos.*, the Seventh Circuit acknowledged that the existence of a grudge on the part of the complainant may necessitate a more thorough investigation to establish probable cause. 797 F.2d 432, 439 (7th Cir.1986). Recently, the court reaffirmed *Gramenos*, and confirmed that if the alleged

victim bears a grudge against the suspect, a reasonable police officer should be suspicious of that person's complaint and investigate further. *Hebron v. Touhy*, 18 F.3d 421, 422–23 (7th Cir.1994). Two tenants had called the police complaining that their landlord had turned off their water and refused them access to their washer-dryer. *Id.* at 422. Because they knew that the tenants were in the process of being evicted, the officers suspected that the tenants harbored a grudge against the landlord. *Id.* at 423. Consequently, they went to the apartment to check out the tenants' story. *Id.* When they arrived, the officers discovered that the tenants' water had indeed been turned off and that the landlord, who lived below, had running water. *Id.* Furthermore, the landlord admitted to the officers that she had denied the tenants access to their property. *Id.* The court held that the officers' investigation was adequate to establish probable cause because the officers had taken steps to verify the tenants' allegations which, in light of their impending eviction, were "of questionable reliability." *Id.* Given the "significant chance that [the tenants] bore a grudge against their landlords," it would have been "unreasonable—and therefore unconstitutional—to arrest the landlords on the tenants' mere say-so." *Id.*

In this case, Cortese denies that Cherny and Bobin harbored such animosity towards Spiegel—according to Cortese, Spiegel is the only person with a grudge. It was he who repeatedly lodged noise complaints against Cherny and Bobin and placed antagonistic notes in their mailbox. Cortese suggests that because Cherny and Bobin never filed any harassment-based complaints against Spiegel until after the May 29th incident, there is no evidence of ill will on their part. Consequently, he distinguishes *Hebron*, which involved a "two way fight"; here,

---

**7.** We find no merit in Cortese's notion that Spiegel suffered from a guilty conscience. This guilty conscience theory is based on the assumption that Spiegel intentionally minimized Cherny's and Bobin's ages in the police report he filled out and then asked whether Cherny and Bobin had filed charges against him. First, the fact that Spiegel inaccurately estimated Cherny's and Bobin's ages does not warrant such a finding.

Spiegel cannot be expected to know his neighbors' exact ages. He was still able to identify each of them as being more than twenty years older than he was. Moreover, construed in the light most favorable to Spiegel, the fact that Spiegel asked Kajari if Cherny and Bobin had filed charges related to the May 29th incident evidences a natural curiosity more than it does a guilty conscience.

by contrast, the harassment allegedly went in only one direction. Defs.' Br. at 9. In addition, Cortese asserts that the HTCA's finding in favor of Cherny and Bobin on Spiegel's noise complaints constitutes objective evidence boosting Cherny and Bobin's reliability. Finally, Cortese claims that Cherny and Bobin could not have held a grudge against Spiegel based on his June 23, 1995 complaint because there is no evidence that they were aware of it. Even if they were, Cortese argues that cross-complaints do not indicate a grudge.[8]

Viewing the facts in a light most favorable to Spiegel, they present a triable issue as to whether Cherny and Bobin were grudge-bearing complainants. First, Spiegel's alleged harassment and noise complaints alone could have fostered a grudge. Far from leaving Cherny and Bobin unbiased, Spiegel's behavior gave them a reason to retaliate against him. Spiegel initiated noise complaints against Cherny and Bobin beginning in early 1993, forcing Cherny and Bobin to appear and defend themselves before the HTCA.[9] On several other occasions, Cherny and Bobin opened their mailbox only to find acrimonious correspondence from Spiegel accusing them of making too much noise. On May 29, 1993, Cherny and Bobin were once again bothered by their irate neighbors. Only this time, Spiegel and Carol had disrupted Cherny and Bobin's Sunday afternoon dinner by pounding on the door and shouting insults. According to Cherny and Bobin, Spiegel's accusations were completely false— the couple insists that they never made an unreasonable amount of noise. Cortese was privy to all this information, having received it during Cherny and Bobin's June 25th interview. From this evidence alone, a jury could infer that Cortese had reason to suspect the trustworthiness of the information provided by Cherny and Bobin, given the distinct possibility that they were upset at their neighbors for continually harassing them about nonexistent noises.[10]

The grudge evidence at Cortese's fingertips was not limited, however, to Cherny and Bobin's perceived harassment over noise. Because Cherny and Bobin waited almost a month to file a police report, they very well could have discovered that Spiegel had filed a report against them on May 31st and returned to file charges on both June 21st and 23rd. Although there is no evidence indicating that Cherny and Bobin were actually aware of the actions Spiegel had taken against them, Cortese knew about the sequence of events, both from reading Spiegel's May 31 police report and his phone conversation with Spiegel on June 25th. A reasonable officer in his position should have been alerted to the possibility of retaliation, and questioned Cherny and Bobin about prior knowledge of Spiegel's police report and charges. This is especially true given Cortese's knowledge that the parties' dispute was ongoing and escalating. That it later came to light that Cherny and Bobin had not been formally served with a summons and complaint when they met with Cortese does not mean that they were unaware of Spiegel's actions against them. Nor does it change what Cortese knew then—that Spiegel filed a police report and charges first, and that Cherny and Bobin's charges came directly on the heels of Spiegel's.

8. Cortese provides no support for this proposition except that "it takes two to tango." As such, we do not address this argument.

9. We find no merit in Cortese's argument that Cherny and Bobin's reliability in reporting the May 29th 1993 incident is boosted by the HTCA's February 1993 resolution of Spiegel's noise complaints in their favor. While the results of the February hearing might bear on the validity of Spiegel's noise complaints, they say nothing at all about the sequence of events on May 29th or the accuracy of Cherny and Bobin's report on those events, Simply because Cherny and Bobin prevailed before the HTCA on the noise issue does not mean that they presented Detective Cortese trustworthy information about an entirely different incident in June.

10. *Burns v. Cineplex Odeon, Inc.*, No. 95 C 5280, 1996 WL 501742, at *5 (N.D.Ill. Sept.3, 1996), which denied a motion to dismiss the plaintiff's false arrest claim, lends further support to our determination. The court in that case found that the officers had reason to suspect that the complainant bore a grudge based on a single argument that he had with the plaintiff over a parking space. Here, the case for a grudge is even stronger because the Spiegel–Cherny–Bobin noise dispute had been ongoing for several months.

The facts before us are easily distinguished from *Gramenos v. Jewel Cos.*, 797 F.2d 432 (7th Cir.1986), where the court found probable cause to arrest based on the testimony of one eyewitness. In *Gramenos*, the police arrested a suspect for shoplifting based solely on the word of the store's security guard. *Id.* at 434. Although a single eyewitness' statement provided the impetus for arrest, the court emphasized that there was no reason to doubt the security guard's credibility; indeed, he had every reason to be truthful:

> [A] guard is not just any eyewitness. The chance that the complainant is pursuing a grudge, a risk in believing an unknown witness, is small in an institutional setting. The guard who pursues a private agenda may be fired and disgraced; there are automatic penalties that the police are entitled to consider. The store will insist that guards err on the side of caution. It does not want to embarrass and anger an honest customer—not only because this is bad for business but also because a false charge of crime may lead to costly tort litigation under state law.

*Id.* at 439. The guard in *Gramenos*, unlike Cherny and Bobin, had no longstanding dispute with the plaintiff. By filing a complaint against Gramenos, he was simply discharging his duty to keep the store safe from theft. Cherny and Bobin, in contrast, had none of the incentives the guard had to be vigilant about the accuracy of their story. Instead, they had motivation to embellish or fabricate facts in order to rid themselves of their vociferous neighbor once and for all. Confronted with the possibility of Spiegel's continued harassment, Cherny and Bobin are much more akin to the tenants in *Hebron*, who faced eviction if they did not take preemptive steps against their landlords.

Nevertheless, Cortese maintains that any credibility questions the grudge raised were overcome by Cherny and Bobin's candor and the objective evidence they provided him. First, Cherny showed Cortese a bruise on his inner thigh, which appeared to Detective Hennelly to be a few weeks old, consistent with Cherny's claim that Spiegel had "kneed" him in the inner thigh on May 29th. This evidence was allegedly corroborated by the photograph of the bruise, taken, Cherny said, on June 1st. Second, according to Cortese, Cherny and Bobin were believable because their narrative was "internally consistent." Third, Cherny's reliability was allegedly supported by documentary evidence that the HTCA found Spiegel's noise complaints unjustified.

The flaw in Cortese's argument is that this "objective" evidence is either dependent on Cherny and Bobin's trustworthiness, which he had reason to question, or it is irrelevant. To begin with, we reject the illogical proposition that Cherny and Bobin's report of the May 29th incident was rendered reliable by the HTCA's earlier and unrelated findings on Spiegel's noise complaints. Cortese cannot use evidence that Cherny and Bobin prevailed on one occasion to prove that they were telling the truth on another. With respect to Cherny's bruise, Cortese had to rely on Cherny's word that Spiegel was its source and that it had been photographed on June 1st. It appeared to Detective Hennelly, however, that the bruise he saw on June 25th was basically the same age as the bruise in the picture. Likewise, the fact that Cherny and Bobin's story was internally consistent did not permit Cortese to ignore other evidence that undermined it. For example, the June 1, 1993 residence incident report that Cherny admits Cortese "may have" seen makes no mention of physical contact. Even if he did not receive this document, the record reflects that Cortese possessed only the first page of the second incident report dated June 1 and June 17, 1993, which also omits allegations of battery—only page two alleges that Spiegel "kicked" Cherny in the right thigh. Viewing these facts in a light favorable to Spiegel, a reasonable jury could find that Cortese had only Cherny's word that Spiegel kicked him—a word tainted by the likelihood that Cherny bore a grudge against Spiegel.[11]

11. Cortese also argues that Cherny and Bobin were believable because they were forthcoming with two facts that could have cast them in a negative light: a history of conflicts with the Spiegels, and the fact that Spiegel was holding his son during the May 29th incident. But a jury is not required to find that their candor on these issues, which arguably hurt Spiegel more than

## B. Cortese's Failure to Conduct an Adequate Investigation

Given that a reasonable jury could conclude that Cherny and Bobin were not reasonably trustworthy sources of information, the next question is whether Cortese nevertheless conducted an investigation that sufficiently compensated for the complainants' possible bias. To establish probable cause, an investigation must be thorough enough to uncover reasonably trustworthy information that would lead a reasonable person to believe that the accused has committed a crime. *Jones,* 106 F.3d at 779. When the officer has reason to question the trustworthiness of the complaining witness because, for example, he appears to harbor ill will against the accused, the officer has a duty to conduct an investigation in an effort to uncover independent evidence that the suspect committed the offense alleged. *Hebron,* 18 F.3d at 423. "Sometimes information from or about a person claiming to be the victim of a crime would lead a reasonable officer to be suspicious, making further investigation prudent—and, because the 'reasonableness' standard of the fourth amendment links the constitutional obligation to the standard of prudent conduct, the officer must do more." *Id.; see also Moore v. The Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1346 (7th Cir.1985) ("If we wish to have our citizen population continue to respect the authority of police ... it is incumbent upon law enforcement officials to make a thorough investigation and exercise reasonable judgment before invoking the awesome power of arrest and detention."). The Seventh Circuit has elaborated on an officer's constitutional duty to perform a reasonable investigation:

> A police officer may not close her or his eyes to the facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place.

*BeVier v. Hucal,* 806 F.2d 123, 127–28 (7th Cir.1986).

In *Moore v. The Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1347 (7th Cir.1985), the court held that a jury could find that the defendant police officers failed to conduct a reasonable investigation in their rush to arrest plaintiffs based solely on the claim by a restaurant manager and a waitress that plaintiffs had refused to pay for their meal. Upon receiving the manager and waitress' complaint, the officers proceeded directly to the plaintiffs' camper, and asked whether they had been at the restaurant in question. When plaintiffs answered affirmatively, the officers arrested them without further inquiry. *Id.* at 1340. The court held that, viewed in a light most favorable to the plaintiffs, the investigation was constitutionally wanting. *Id.* at 1346. Armed with just one side of the story, the police hurried to arrest the plaintiffs, who showed no signs of fleeing—they were sleeping in their camper at the time—for a minor offense. *Id.* at 1345. The officers never asked the plaintiffs for their side of the story, but made the arrest based on the mere fact that plaintiffs admitted their presence at the restaurant that evening. *Id.* Had the officers "used reasonable judgment and conducted a proper investigation, inquiring both as to the plaintiffs' presence in the restaurant and the dispute over the bill," the plaintiffs' rights would have been preserved. After hearing both versions of the incident, the police could then have undertaken further investigation in order to resolve the dispute reasonably. *Id.* at 1345–46.

By contrast, the officers in *Hebron v. Touhy,* 18 F.3d 421, were found to have conducted a reasonable investigation because they went beyond the tenant-complainant's allegations, which might well have been tainted by spite. Not content with soon-to-be-evicted tenants' word that the landlord had deprived them of running water and access to their property, the officers went straight to the scene of the alleged crime and asked the suspect for her version of the facts. *Id.* at 423. In other words, by making the effort to double-check the complainant's story instead of rushing blindly to arrest the suspect before she could offer an explanation, the officers obtained an independent source of evidence that supported the tenants' accusations. This ensured that their probable

Cherny and Bobin, rendered them reasonably trustworthy.

cause determination was premised on reasonably trustworthy information.

■ Cortese's "investigation" resembles the officers' shoddy investigation in *Moore*, not the reasonable inquiry in *Hebron*. First, like the police in *Moore*, Cortese rushed to make an arrest without obtaining an explanation from the suspect. Relying exclusively on two witnesses whose neutrality was open to question, Cortese called Spiegel immediately after interviewing the complainants and instructed him to come to the police station with bond money. He never asked Spiegel for his side of the story; in fact, he blatantly ignored Spiegel's statements that Cherny and Bobin were the ones who had committed battery, that he had witnesses to prove it, and that Cherny and Bobin's charges were false and retributive claims filed in retaliation for the police report, summons and complaint that Spiegel had filed against them first. Second, in contrast to the police in *Hebron*, Cortese made no efforts to corroborate Cherny and Bobin's allegations with independent evidence.[12] He never investigated the scene of the crime or interviewed the witnesses residing in Hollywood Towers whose names were provided to him. Although Cortese had read Spiegel's police report listing his wife as a witness to the May 29th incident, Cortese asked Carol nothing about the altercation when he talked to her on the phone. Instead of taking this opportunity to get potentially valuable information, Cortese simply told Carol that Spiegel was to call the police station on pain of arrest. In addition, he knew that at least one other Hollywood Towers resident, Hanan Hughs, had witnessed the event, but made no effort to contact her. And he never attempted to contact anyone from the HTCA or to request from the Association any documentation it may have had relating to the May 29th incident. Third, like the suspect in *Moore*, Spiegel's alleged offense was minor—misdemeanor battery—and he demonstrated no risk of flight. Instead of avoiding the police, Spiegel promptly returned Cortese's phone call and went to the police station as requested. Yet Cortese moved to arrest Spiegel with remarkable speed and little information—the same day as Cherny and Bobin's interview. Under these circumstances, a reasonable jury could find Cortese's investigation inadequate because it was not based on the independent evidence necessary to produce reasonably trustworthy information.

Cortese responds with several arguments. First, he insists that he did not have a duty to investigate further because once probable cause is found, an officer need not interview other witnesses who would allegedly corroborate a suspect's claims of innocence. While this is undoubtedly true, it begs the question of whether probable cause was present in the first place. Probable cause exists when there is reasonably trustworthy information to warrant a prudent person in concluding that a crime had been committed. *Jones v. Watson*, 106 F.3d 774, 779 (7th Cir.1997). As we have already held, a reasonable officer would have questioned Cherny and Bobin's trustworthiness based on the possibility that they bore a grudge against Spiegel for repeatedly harassing them about noise.

■ Second, Cortese claims that the law requires only that he interview witnesses who were "readily available" to him. Because no witnesses other than Cherny and Bobin were within Cortese's "immediate grasp," he contends, he had no duty to seek them out. In support of this theory, Cortese cites several cases. *See Sevigny v. Dicksey*, 846 F.2d 953 (4th Cir.1988); *Moore*, 754 F.2d 1336; and *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423 (10th Cir.1984). Cortese, however, misperceives the holdings in these cases. These decisions hold that, under certain circumstances, a police officer is required to conduct more than a superficial investigation before determining probable cause. More importantly, none of these decisions has held that an officer's constitutional duty to make a probable cause determination is *restricted* to questioning only those wit-

---

12. Cortese claims that viewing Cherny's bruise and the picture of it taken right after the alleged battery constituted an investigation into independent evidence. However, as we pointed out earlier, the bruise and the photograph were not objective sources of evidence because they depend entirely the trustworthiness of Cherny's statements as to who caused the bruise and when the picture was taken.

nesses who are immediately available. *See Sevigny,* 846 F.2d at 957–58; *Moore,* 754 F.2d at 1345–46; *Lusby,* 749 F.2d at 1432. In other words, interviewing immediately available witnesses is a necessary, but not sufficient, condition to a reasonable investigation. Furthermore, permitting police officers to stop an investigation after questioning only witnesses within their immediate grasp would produce absurd results. Investigating officers are not always at the scene of the crime and able to question witnesses. It does not follow that these witnesses are unavailable to the officers for questioning. In this case, there is no reason why Cortese could not have asked Spiegel or his attorney for the names and phone numbers of the witnesses whom Spiegel told Cortese would substantiate his story. Cortese could then have followed up simply by picking up his telephone.[13]

Simply put, we find that a reasonable jury could conclude that Cortese knowingly abused his arrest powers under the circumstances of this case. Our holding that a reasonable jury could find Cortese's investigation lacking is further bolstered by the fact that it was not commensurate with the gravity of Spiegel's alleged crime and the danger of its imminent repetition. *See Llaguno v. Mingey,* 763 F.2d 1560, 1566 (7th Cir.1985) (extent of required investigation is greater where offense is not serious and is unlikely to be repeated). In *Llaguno,* the police had a limited amount of information to support probable cause, but because the suspect was accused of murder, the court found his initial arrest acceptable, holding that "[i]f a multiple murderer is at large, the police must compress their investigation and make their decision to search or arrest on less information than if they could investigate at their own leisure."[14] *Id.* at 1566–67. Given the fact that a shooting had occurred and the police were fearful of its imminent repetition, the court found the scope of the investigation reasonable. *Id.*

The present situation is far removed from *Llaguno,* which involved a serious felony and the danger that the suspect would kill again. *Id.* Here, Spiegel was accused of committing a misdemeanor battery that produced a lone bruise. Moreover, Cortese had no reason to believe that Spiegel would repeat his alleged actions. There was no evidence of previous physical altercations between Cherny and Spiegel, nor that Spiegel was a violent person. In the month between the alleged battery and Cherny's visit to the police station, there were no reports of altercations between the Spiegels and Cherny and Bobin, and Cortese does not state that he was fearful that the May 29th incident would be repeated. Instead, Cortese says that he cut off his investigation because Spiegel's lawyer informed him that Spiegel would not provide any further information. While Cortese was not able to further question Spiegel, Cortese remained free to carry out his investigation by questioning other witnesses. An officer is not permitted to retaliate against a suspect for invoking his Fifth Amendment rights by refusing to conduct a proper investigation.

---

13. Cortese maintains that Spiegel would have been arrested regardless of whether he continued his investigation. He claims that to upset a finding of probable cause, the evidence considered in hindsight must exculpate the arrestee. Once again, Cortese points to *Sevigny,* 846 F.2d 953; *Moore,* 754 F.2d 1336; and *Lusby,* 749 F.2d 1423, These cases fail to provide the support that Cortese seeks. None of these cases held that the information that would have been obtained through a more thorough investigation needed to be exculpatory—only that it may have been. *Sevigny,* 846 F.2d at 958, *Moore,* 754 F.2d at 1345–46, *Lusby,* 749 F.2d at 1432. While Cortese asks us to consider Hughes' testimony alone as proof of Spiegel's guilt, we must note that Hughes is not the only witness presented by Spiegel, and whether her testimony exculpates Spiegel is a question for the jury. To embark on such a task

as comparing witnesses to find out whether or not the totality of the testimony would exculpate Spiegel would require the Court to judge the credibility of these witnesses. On a motion for summary judgment, however, the Court may not do so. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. Moreover, the witnesses and evidence available to Cortese here did, eventually, exculpate Spiegel. The same witnesses that Cortese suggests would not exonerate Spiegel testified at Spiegel's criminal trial, where he was acquitted of all charges.

14. The court found that while the initial arrest was lawful, the evidence discovered by the police after the arrest did not warrant detaining the suspect for forty-two hours. *Llaguno,* 763 F.2d at 1567.

Viewing all disputed facts in Spiegel's favor, as we must, we find that a reasonable jury could conclude that Cherny and Bobin were grudge-bearing complainants and that Cortese should have conducted a more thorough investigation by searching for independent evidence. In short, we find a genuine issue of material fact as to whether Cortese had probable cause to arrest Spiegel.

## II. Sergeant Kajari's Involvement

 "Section 1983 creates a cause of action based upon personal liability and predicated upon fault." *Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983). Consequently, for a supervisory official to be liable under § 1983, that official must have had direct responsibility for the improper action. *Id.* There must be a "causal connection, or an affirmative link, between the misconduct complained of and the official sued." *Id.* Personal liability for the constitutional violation exists, for example, if the official "know[s] about the conduct and facilitate[s] it, approve[s] it, condone[s] it, or turn[s] a blind eye." *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir.1988). Mere negligence is insufficient. *Id.* In short, the plaintiff must demonstrate that the official knowingly, willfully, or recklessly "caused the alleged deprivation by his action or failure to act." *Rascon v. Hardiman,* 803 F.2d 269, 274 (7th Cir.1986).

 Kajari contends that he is not liable under § 1983 because he did not participate in the decision to arrest Spiegel. While he admits that he assigned Cortese to investigate Cherny and Bobin's report, and maintained overall responsibility for supervising that investigation, he denies having discussed the investigation with Cortese or having spoken with Spiegel about the case.

What Kajari conveniently ignores is that Spiegel testified that he talked to Kajari on the phone right after Cortese told him to come down to the station. During his conversation with Kajari, Spiegel claims he explained that: 1) he had filed a police report against Cherny and Bobin right after the May 29th incident, nearly a month before Cherny and Bobin's interview; 2) Cherny and Bobin were the ones guilty of battery,

and he had witnesses to prove it; and 3) Cherny and Bobin's charges against him were retaliatory, filed in response to Spiegel's police report and the complaint and summons he had sworn out a day earlier. Spiegel states that Kajari responded that he would not interfere with Cortese's investigation. Viewed in Spiegel's favor, these facts support a finding that Kajari, as Cortese's direct supervisor, participated in the arrest by approving Cortese's decision with full knowledge of facts that would have led a reasonable officer to investigate further. Kajari's contrary testimony that he never spoke to Spiegel creates a swearing contest that the jury must resolve.

In addition, Spiegel maintains that Kajari knew all these facts as early as June 21, when Spiegel first talked to Kajari about filing charges against Cherny and Bobin. Told not once, but twice, about circumstances that called the reliability of the complaining witnesses into question and warranted further investigation, Kajari turned a blind eye to the actions of the officer he was supposed to supervise by failing to intervene. Under these circumstances, a jury could reasonably conclude that Kajari acted with reckless indifference by failing to prevent Spiegel's arrest. *See Rascon v. Hardiman,* 803 F.2d 269, 274 (7th Cir.1986) (§ 1983 liability may be premised on a knowing, wilful or reckless failure to act).

## III. Qualified Immunity

 The availability of qualified immunity is generally a legal question for the court to decide "at the earliest possible stage in litigation." *Forman v. Richmond Police Dept.,* 104 F.3d 950, 957 (7th Cir.1997) (citations and internal quotations omitted). If the issue of qualified immunity turns on disputed facts, however, the jury must resolve them at trial. *Green v. Carlson,* 826 F.2d 647, 652 (7th Cir.1987) (qualified immunity not appropriate for summary judgment when there are genuine issues of material fact); *Irvin v. Kaczmaryn,* 913 F.Supp. 1190, 1200 (N.D.Ill.1996) ("Where the facts giving rise to qualified immunity are disputed, summary judgment is not proper.") (citations and internal quotations omitted). An arresting of-

ficer is immune from the vagaries of trial " 'if a reasonable officer could have believed [the plaintiff's arrest] to be lawful, in light of clearly established law and the information the officer possessed.' " *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991). The Seventh Circuit has adopted a two-step analysis to guide courts in resolving this issue: "1) Does the alleged conduct set out a constitutional violation? and 2) Were the constitutional standards clearly established at the time in question?" *Forman,* 104 F.3d at 957.

■■■■ Courts often address the second prong first in order to avoid having to pass on the constitutionality of an officer's particular actions—for if a right is not clearly established, a reasonable officer could not be said to have known about it. *See id.* at 958. The plaintiff has the burden of proving that the right allegedly violated is clearly established. *Id.* at 957–58. To meet this burden, the plaintiff need not point to a case finding the same exact action to be unlawful or a case that is "on all fours" with the present set of facts and circumstances. *Id.* at 958. A "clearly analogous" case decided before the officer's action or inaction in the present case is sufficient to confirm that a right is clearly established. *Id.* Examined in light of the analogous case, the unlawfulness of the officer's actions must have been "apparent" at the time he took them. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

■■■■ Only if the law is clearly established must the court move on to ask whether the officer's actions were constitutional. The plaintiff must show that "reasonable officers confronting the specific facts and relevant law in [the case before the court] would have known that their conduct violated [the plaintiff's] constitutional rights." *Maxwell v. City of Indianapolis,* 998 F.2d 431, 435 (7th Cir. 1993). The Supreme Court has emphasized that "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter,* 502 U.S. at 227, 112

S.Ct. at 536 (citations and internal quotations omitted).

In light of these standards, we must ask the following questions. First, at the time Spiegel was arrested in 1993, was it clearly established that an arresting officer had a duty to look beyond a victim's complaint if he had reason to believe that the victim was not trustworthy? Second, could any reasonable police officer nonetheless have mistakenly believed that there was probable cause to arrest Spiegel based solely, on Cherny's and Bobin's claims?

■■■■ To answer the first question, it was clearly established as of June 1993 that probable cause, or at least a reasonable belief that there is probable cause, is required to avoid liability for false arrest under § 1983. *BeVier v. Hucal,* 806 F.2d 123, 126 (7th Cir.1986). Although this standard is not sufficiently particularized to alert a reasonable officer as to the constitutionality of a particular action, *see Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038–39, there is clear binding authority that condemns the investigatory methods the officers used here. In *Moore v. The Marketplace Restaurant, Inc.,* the court established a police officer's duty to conduct a thorough investigation and "exercise reasonable judgement before invoking the awesome power of arrest and detention." 754 F.2d at 1345–46. Earlier in this opinion, we found the actions taken by the police in *Moore* clearly analogous to the officers' conduct here. Moreover, both the Supreme Court and the Seventh Circuit have held since at least 1985 that for an arrest to be constitutional, the information relied upon in finding probable cause must be reasonably trustworthy.[15] *Hunter,* 502 U.S. at 228, 112 S.Ct. at 536–37; *Moore,* 754 F.2d at 1345. While the Seventh Circuit did not definitively state that a grudge would render a particular complainant untrustworthy until *Hebron* in 1994, the fact that a grudge situation was not before the Seventh Circuit until *Hebron* does not exonerate Cortese or Kajari. Whatever term the courts decide to use, common sense

---

**15.** As far back as 1986, the Seventh Circuit acknowledged that if there is reason to suspect that the complainant bears a grudge, the investigating officer is not entitled to act on that person's complaint alone. *Gramenos,* 797 F.2d at 439.

dictates that a reasonable police officer should question the trustworthiness of complainant who harbors ill feelings toward the suspect, and investigate further in search of more reliable evidence. The Seventh Circuit has encouraged the use of common sense in conducting criminal investigations:

> If we may be so bold as to paraphrase Justice Holmes' thought, "there is no law against using common sense"; indeed, the use of common sense is a prerequisite for police officers in developing their investigation in order to effectuate a valid arrest.

*Moore,* 754 F.2d at 1346. Thus, we find that, as of Spiegel's arrest in 1993, it was clearly established that the police must base probable cause determinations on reasonably trustworthy information and, if necessary, conduct a thorough investigation to find it. These are the very standards that Cortese is alleged to have violated in this case—making the unlawfulness of his conduct "apparent."

 Despite this clearly established law, Cortese and Kajari would still be entitled to qualified immunity if a reasonable police officer could have mistakenly believed that there was probable cause to arrest Spiegel. This puts us in the perilous position of determining whether a reasonable officer could have reasonably, albeit mistakenly, believed that the information he received from Cherny and Bobin was reasonably trustworthy—and we cannot see how the extra layer of reasonableness adds anything to the probable cause analysis undertaken in the first part of the opinion. The Seventh Circuit has recognized that the question of probable cause in unlawful arrest cases is virtually indistinguishable from the qualified immunity issue:

> The rub here lies in the substantial, if not complete, overlap of the issue of immunity and the principal issue on the merits. The three officers attempt to draw a distinction by contending that the relevant inquiry is into "arguable probable cause," which is another way of asking whether they had probable cause to think they had probable cause. This assumes, however, that probable cause, itself measured on a shifting scale, is independent of what an arresting officer could reasonably have known. If that were true, the belief of the three

police officers that [the information they possessed] created probable cause would be grounds for granting immunity, irrespective of the actual existence of probable cause. But the conduct of the police officers would then depend on their subjective good faith, rather than an objective standard. We require the latter.

*Maxwell,* 998 F.2d at 435–36; *see also Moore,* 754 F.2d at 1357 (Posner, J., concurring) (qualified immunity depends on whether police had probable cause to arrest).

We find that Cortese and Kajari's actions in arresting Spiegel on the word of Cherny and Bobin without further investigation could be found objectively unreasonable, defeating their qualified immunity defense on summary judgment. *See Maxwell,* 998 F.2d at 436 (officers not entitled to qualified immunity defense where their conduct may be found objectively unreasonable). Viewing the facts most favorably to Spiegel, we find that neither officer could have reasonably but mistakenly concluded that there was probable cause for arresting Spiegel. A reasonable police officer in Cortese's shoes would have been suspicious of Cherny and Bobin's month-old claim and the possibility that they bore a grudge against Spiegel and conducted a more thorough investigation to uncover independent evidence. Similarly, a reasonable officer in Kajari's position—fully informed of all the facts—would have intervened to prevent Spiegel's arrest. In *Green v. Carlson,* 826 F.2d 647, 652 (7th Cir.1987), the court held that if there are questions of fact upon which the issue of qualified immunity depends, summary judgment should be denied. Such material facts exist here, and we cannot say as a matter of law on the undisputed facts that the defendants' actions were objectively reasonable. The Court therefore rejects summary judgment on Cortese's and Kajari's qualified immunity defense.

## CONCLUSION

The defendants' motion for summary judgment is hereby denied. We reject Cortese and Kajari's qualified immunity defense, but, if appropriate, will permit them to raise at trial a damages immunity defense. This case

is hereby set for trial on June 30, 1997 at 10:00 a.m. A modified pretrial order, which consists of agreed and disputed lists of trial exhibits, witnesses, and jury instructions, will be due on June 26, 1997. A Final Pretrial Conference will be held in chambers on June 27, 1997 at noon.