Virgil JONES, Plaintiff–Appellant,

v.

Ronald WATSON, J. Volland, and W. Stec, Defendants–Appellees.

No. 96–1938.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 6, 1996.

Decided Feb. 10, 1997.

John C. Ambrose, Thomas M. Cushing (argued), Marilyn J. Martin, Ambrose & Cushing, Chicago, IL, for Plaintiff–Appellant.

Lawrence Rosenthal, Benna R. Solomon, Timothy W. Joranko (argued), Susan S. Sher, Office of the Corporation Counsel, Chicago, IL, for Defendants–Appellees.

Before CUMMINGS, RIPPLE, and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge.

On August 28, 1992, and again on August 31, 1992, Chicago Alderman Virgil Jones was arrested and charged with disorderly conduct while protesting at a Chicago Transit Authority ("CTA") construction site. Jones filed a lawsuit under 42 U.S.C. § 1983, alleging, among other things, that the Chicago Police officers involved in his arrest (defendants Chicago Police Commander Ronald Watson and Police Officers James Volland and William Stec) violated his Fourth Amendment right to be free from unlawful seizure.[1] Finding that Jones' arrest was supported by probable cause and that all defendants were entitled to qualified immunity, the magistrate judge granted their motion for summary judgment. For the reasons that follow, we affirm.

## I. BACKGROUND

On August 28, 1992, and on August 31, 1992, Alderman Jones and a number of other public officials and private citizens went to a CTA construction site at 74th and Wood to protest what they believed to be non-compliance with minority hiring requirements at the worksite. On both occasions, Alderman Jones and some of the other demonstrators crossed from the north side of 74th Street over to the south side—near the fence surrounding the site's perimeter. Many other protesters demonstrated on the north side of the street. Estimates of the number of protesters present at the site range from ten to fifty.[2] Chicago Police officers, including Commander Watson, were at the scene on both occasions. Watson testified that he had been informed that there was going to be a demonstration on the 28th and that Alderman Jones was going to stop work at the site.

The protesters who had crossed over to the south side of the street demonstrated in front of a gate that allowed access into and out of the site. The City of Chicago had previously issued a temporary driveway permit to the Walsh Construction Company to allow ingress and egress over the sidewalk at the worksite on 74th Street. The construction company laid gravel over the curb to create an inclined driveway for vehicles to pass over the curb, traverse the sidewalk and

---

**1.** Jones' Second Amended Complaint also alleged that his arrest infringed the "peaceful exercise of his rights of congregation, free speech and petition as set forth in the First and Fourteenth Amendments to the Constitution of the United States and in sections four and five of Article I of the Constitution of the State of Illinois." He further alleged that, in addition to violating the Fourth Amendment, his arrest violated section two of Article I of the Illinois Constitution and "his right as an Alderman to inspect construction sites pursuant to the ordinances of the City of Chicago." Second Am. Compl. Count I, para. 4; *id.* Count II, para. 3. In their motion for summary judgment below, defendants specifically argued that they were entitled to judgment on Jones' First Amendment claim. Because Jones did not respond to this argument, the magistrate judge concluded that Jones had abandoned that claim, and found that defendants were therefore entitled to summary judgment as to it. Jones does not contest that determination. The defendants also argued (correctly) in their motion for summary judgment that violations of state law or local ordinance cannot support a claim under § 1983. Jones did not respond to that argument

either. Although the magistrate judge's opinion is silent as to this issue, it is apparent that Jones also abandoned whatever § 1983 claims he thought he had as a result of state law and local ordinance violations. We note that the magistrate judge's opinion does "direct the clerk to enter judgment in favor of the defendants on the entire complaint," and on appeal Jones does not press any issues relating to state or local law violations. Accordingly, the only issues now before the Court relate to Jones' Fourth Amendment claims.

**2.** During his deposition, Alderman Jones stated that, although he "didn't count heads," he knew that the number of demonstrators "wasn't less than thirty." Officer Volland estimated that there were approximately ten to fifty demonstrators present on August 28, and Commander Watson testified that there were "10, 12, 15, 20, I don't know" demonstrators on the north side of the street. Officer Stec testified that on August 31 there were "approximately 30" protesters on the north side of the street in addition to the seven who were arrested while demonstrating on the south side of the street.

enter (or exit) the gate.[3] During his deposition Watson was asked "whether the CTA or any construction contractor out at that site obtained a permit to have a driveway across that public sidewalk," to which he replied, "I can only tell you that they had a permit for their construction that was posted at the site."[4] When Alderman Jones crossed over to the south side of the street on August 28, he attempted to read the construction permit that was posted on the perimeter fence but a worker inside the job site removed the permit so that it could not be viewed.[5] Jones complained to Watson that the permit was not posted and requested to see it. Jones also told Commander Watson that as an alderman he had a right to make an inspection of any construction in his ward.[6] Watson told Jones that if he and the other protesters blocked the gate and refused to move they would be arrested. Watson gave Jones and the other protesters several warnings to move back to the north side of the street. Shortly thereafter, those protesters in front of the gate, including Jones, were arrested and charged with disorderly conduct under the Chicago Municipal Code.

More of the same followed on August 31. Alderman Jones and other protesters stood in front of the gate, this time with their arms interlocked. Watson again informed Jones that if he blocked the gate and refused to move he would be arrested. Jones and the others protesters did not move. When Watson ordered that Jones be arrested, Jones was still standing in front of the gate with his arms interlocked with the other protesters.

Officer Volland, who arrested Jones on August 28, and Officer Stec, who arrested Jones on August 31, effected the arrests at Watson's direction.

Jones' civil rights suit alleges that he was arrested without probable cause. The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. In moving for summary judgment, defendants argued that probable cause did in fact exist and in any event qualified immunity shielded them from liability. The magistrate judge agreed with defendants on both scores and entered judgment in their favor.

## II. ANALYSIS

### Standard of Review

■ We review a district court's grant of summary judgment and its determination that the defendants are entitled to qualified immunity *de novo*. *Forman v. Richmond Police Department*, 104 F.3d 950, 955–57 (7th Cir. 1997); *Booker v. Ward*, 94 F.3d 1052, 1057 (7th Cir.1996), certiorari denied, —— U.S. ——, 117 S.Ct. 952, 136 L.Ed.2d 840 (1997); *Edwards v. Cabrera*, 58 F.3d 290, 293 (7th Cir.1995); *Burns v. Reed*, 44 F.3d 524, 529 (7th Cir.1995), *cert. denied*, —— U.S. ——, 115 S.Ct. 2583, 132 L.Ed.2d 832 (1995); *Maltby v. Winston*, 36 F.3d 548, 555 & n. 7 (7th Cir.1994), certiorari denied, —— U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995).[7]

---

3. In his opening brief on appeal, Jones faults the magistrate judge for crediting this statement as an uncontested fact. However, the record reveals that it was Jones himself who offered the statement in his Local Rule 12(N) statement of uncontested facts.

4. Watson could not recall whose name was on the permit or what the permit specifically authorized, commenting only "It was a permit issued by the City of Chicago for that construction site."

5. It is apparent from Jones' testimony that the permit was re-posted on the fence at the time of the August 31 demonstration and arrest.

6. It appears from the record that the construction site was actually not in Alderman Jones' ward. Jones is an alderman for the Fifteenth Ward. The CTA property at 74th and Wood is located in the Seventeenth Ward.

7. As a panel of this Court recently noted, "[t]here has been some tension identified in our cases with respect to the proper standard of review in qualified immunity cases in which probable cause is at issue. *See Maltby v. Winston*, 36 F.3d 548, 555–556 n. 7 (7th Cir.1994) (criticizing *Mahoney v. Kesery*, 976 F.2d 1054 (7th Cir.1992))." *Edwards v. Cabrera*, 58 F.3d 290, 293 (7th Cir. 1995). As is evident from this excerpt, the tension traces back to the *Mahoney* decision, in which a panel of this Court held that the "clear error" standard of review should be applied in these cases. The *Mahoney* panel's holding appears to have been based on the joint premises that (1) the qualified immunity determination and the probable cause determination effectively merge with one another because the "determination that there was or was not probable cause will automatically resolve both immunity and the merits," 976 F.2d at 1059; see also *Boyce v. Fernandes*, 77 F.3d 946, 948 (7th Cir.1996)

*Qualified Immunity*

■ The doctrine of qualified immunity shields public officials performing discretionary functions from liability for civil damages where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The doctrine serves the purpose of protecting public officials " 'from undue interference with their duties and from potentially disabling threats of liability.' " *Elder v. Holloway,* 510 U.S. 510, 514, 114 S.Ct. 1019, 1022, 127 L.Ed.2d 344 (1994)(quoting *Harlow,* at 806, 102 S.Ct. at 2731–32).

■ In the specific context of a damages action brought under 42 U.S.C. § 1983 stemming from a warrantless arrest, the arresting officers will be immune from liability "if 'a reasonable officer could have believed [the plaintiff's arrest] to be lawful, in light of clearly established law and the information the arresting officers possessed.' " *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987)). A warrantless arrest is lawful under the Fourth Amendment if supported by probable cause. *Beck v. Ohio,* 379 U.S. 89, 90, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Thus, the officers are entitled to immunity if a reasonable officer could have believed that probable cause existed to support the arrest. *Hunter,* 502 U.S. at 228, 112 S.Ct. at 536–37. Significantly, "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter* at 227, 112 S.Ct. at 536; see also *Edwards v. Cabrera,* 58 F.3d 290, 293 (7th Cir.1995) ("Even if probable cause was lacking ... [the arresting officers] are entitled to immunity as long as their belief

("Where the only issue bearing on immunity is whether the defendant had probable cause to make the search or arrest that is challenged, merits and immunity merge; the dispositive question is simply whether the defendant did have probable cause.") and (2) "the standard of review of a factual determination of probable cause is ... clear error," *id.* (citing *United States v. Spears,* 965 F.2d 262, 269 (7th Cir.1992), certiorari denied, 506 U.S. 989, 113 S.Ct. 502, 121

was reasonable."); *Maltby v. Winston,* 36 F.3d 548, 555 (7th Cir.1994), certiorari denied, — U.S. —, 115 S.Ct. 2576, 132 L.Ed.2d 827. So long as "officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). As a panel of this Court put it in *Jones v. City of Chicago,* 856 F.2d 985, 994 (7th Cir.1988): "only if no reasonable officer could have mistakenly believed that he had probable cause to arrest is the immunity forfeited." See also *Eversole v. Steele,* 59 F.3d 710, 717–718 (7th Cir.1995) ("If a case involves a question of whether probable cause existed to support an officer's actions, the case should not be permitted to go to trial if there is any reasonable basis to conclude that probable cause existed.") (internal quotation marks and citations omitted). Guided by these principles and standards, we now consider the merits of Jones' appeal.

*Jones' Disorderly Conduct Arrest*

■ The undisputed facts of this case reveal that Commander Watson had been informed that a demonstration was to take place at the CTA construction site and that Alderman Jones intended to "stop work" at the site. Watson was aware of a permit issued by the City of Chicago for the construction site. It is also undisputed that in connection with the construction project a temporary driveway had been set up so as to allow vehicles to drive over the street curb, across the sidewalk and through a gate allowing ingress and egress to and from the site. The City of Chicago had issued a permit expressly authorizing such a temporary driveway. The demonstrators positioned themselves in front of the gate by the driveway. Although there is no evidence in the

L.Ed.2d 438 (1992)). Of course the Supreme Court recently held that the proper standard for reviewing a probable cause determination is *de novo* review. *Ornelas v. United States,* — U.S. —, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Thus, by *Mahoney's* own reasoning, it must now be concluded that the proper standard in qualified immunity cases where probable cause is at issue is *de novo* review.

record that any work had actually commenced, Commander Watson testified workers were arriving at the site at the time of the demonstration (indeed, Jones' claim that a worker removed the permit from the perimeter fence confirms that workers were indeed present at the site) and a truck was located down the street apparently awaiting entry to the site.[8] Watson directed Jones to the other side of the street and warned him that if he did not go to the other side he would be arrested. Shortly thereafter he was. A repeat performance ensued on August 31 when Jones and other protesters returned, expressed the same concerns, stood with arms interlocked in front of the gate, and refused to move when directed to do so by Watson, resulting in their arrest.

■■■ On these facts, there was plainly probable cause to arrest Jones for disorderly conduct. Probable cause exists "if 'at the moment the arrest was made ... the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing'" that the arrestee was committing an offense. *Hunter,* 502 U.S. at 228, 112 S.Ct. at 537 (quoting *Beck,* 379 U.S. at 91, 85 S.Ct. at 225–26); see also *Booker v. Ward,* 94 F.3d 1052, 1058 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 952, 136 L.Ed.2d 840 (1997). It is well-established in Illinois that the act of blocking the free flow of pedestrian or vehicular traffic on public ways will support a conviction for the offense of disorderly conduct. See *City of Chicago v. Fort,* 46 Ill.2d 12, 262 N.E.2d 473 (Ill.1970) (affirming disorderly conduct convictions of individuals who, among other things, were "blocking public passage on a sidewalk" and "standing in such a way as to block the entrances to a tavern, a laundromat, and a poolroom," and who refused to disperse when directed to do so); *People v. Raby,* 40 Ill.2d 392, 240 N.E.2d 595 (Ill.1968) (affirming disorderly conduct conviction of demonstrator who blocked vehicular traffic by sitting (or lying) down in an intersection), certiorari denied, 393 U.S.

1083, 89 S.Ct. 867, 21 L.Ed.2d 776 (1969); *City of Chicago v. Joyce,* 38 Ill.2d 368, 232 N.E.2d 289 (Ill.1967) (affirming disorderly conduct conviction of demonstrator who sat on the sidewalk, blocking entrance to City Hall and obstructing sidewalk traffic, and who ignored order to disperse). In each of these three cases, the Illinois Supreme Court relied on the United States Supreme Court's opinion in *Cox v. Louisiana,* 379 U.S. 536, 554–555, 85 S.Ct. 453, 464–65, 13 L.Ed.2d 471 (1965), wherein the Court remarked:

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. * * * Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations.

See also *Bachellar v. Maryland,* 397 U.S. 564, 571, 90 S.Ct. 1312, 1316, 25 L.Ed.2d 570 (1970) (reversing convictions of anti-war protesters where the record left open the possibility that their arrests were content-based, but noting "petitioners' convictions could constitutionally have rested on a finding that they sat or lay across a public sidewalk with the intent of fully blocking passage along it, or that they refused to obey police commands to stop obstructing the sidewalk in this manner and move on").

The Chicago Municipal Code defines the offense of disorderly conduct as encompassing, among other things, the following:

---

8. There is some dispute as to whether the truck was attempting to enter the site at the time of the arrest or whether it was simply parked down the street awaiting later entry. Given the posture of this case, we credit Jones' contention that the truck was simply parked down the street; however, this dispute is immaterial to the outcome of the case.

knowingly:

(a) Do[ing] any act in such unreasonable manner as to provoke, make or aid in making a breach of peace; or . . .

(d) Fail[ing] to obey a lawful order of dispersal by a person known . . . to be a police officer under circumstances where three or more persons are committing acts of disorderly conduct in the immediate vicinity, which acts are likely to cause substantial harm or serious inconvenience, annoyance or alarm; or

(e) Assembl[ing] with three or more persons for the purpose of using force or violence to disturb the public peace[.]

CHICAGO MUNICIPAL CODE § 8–4–010.

■ There is no dispute that Jones and his fellow demonstrators planted themselves squarely in front of the construction site gate (directly in the path of the temporary driveway that had been erected) in such a manner as would obstruct any attempt by the nearby construction truck to enter the site. In light of cases such as *Fort*, *Raby*, and *Joyce*, such obstruction of vehicular traffic over an authorized driveway could reasonably be regarded as disorderly conduct. It is also undisputed that Jones knew Watson to be a police officer and that Watson had given an order of dispersal that was refused by Jones. Furthermore, a reasonably prudent person could

have readily concluded that the blockade of the construction site gate—as part of a demonstration aimed at stopping work at the site—was likely to cause serious inconvenience or annoyance. These facts plainly establish that Watson[9] had probable cause to arrest Jones for violation of § 8–4–010(d) of the municipal code.[10]

■ We find it immaterial that the truck at issue may still have been located down the street at the moment that Jones and the other protesters were arrested. The record reflects that workers had arrived at the site and there can be little serious debate about the truck's ultimate destination. That Jones and the others refused to move away from the gate and driveway when instructed to do so—going so far as to lock arms together on the second occasion—plainly manifested their intent (consonant with Watson's understanding that Jones' objective was to "stop work" at the site) to preclude persons or materials from passing through the gate. Indeed, if the demonstrators' purpose was anything other than blocking movement through the gate it is difficult to imagine why they would insist on positioning themselves in front of the gate. Under these circumstances, Watson could reasonably have concluded that Jones' conduct constituted disorderly conduct even without forcing the issue by signalling

**9.** Of course, Watson's probable cause determination may be imputed to the officers who actually effected Jones' arrest. See *United States v. Randall*, 947 F.2d 1314, 1319 (7th Cir.1991) (observing that " '[t]he police who actually make the arrest need not personally know all the facts that constitute probable cause . . . the arrest is proper so long as the knowledge of the officer directing the arrest . . . is sufficient to constitute probable cause.' ") (quoting *United States v. Valencia*, 913 F.2d 378, 382–383 (7th Cir.1990)); see also *Maltby v. Winston*, 36 F.3d 548, 564 n. 26 (7th Cir. 1994) ("The collective knowledge doctrine is designed to allow law enforcement personnel from the same agency, or from different jurisdictions, to rely on the probable cause determinations of one another in order to apprehend specific suspects."), certiorari denied, — U.S. —; 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995).

**10.** While we have analyzed the probable cause question with reference to subsection (d), we note that the criminal complaint issued against Jones following his August 28 arrest did not specify any subsection of the City's disorderly

conduct ordinance and simply described his offense in the following terms: "knowingly and intentionally refused to move, from gate leading to a construction site, after twice being asked to do so, in an unreasonable manner as to alarm and disturb officer Volland, and provoke a breach of the peace." Although it is somewhat illegible, the August 31 complaint appears to specify subsection (a) of § 8–4–010 and describes the offense as: "knowingly and with intent blocked vehicles from entering and exiting the construction site on C.T.A. property after a lawful order of dispersal by a person known by him as a police officer." All of this is largely irrelevant for present purposes. As this Court has noted in the past and the magistrate judge correctly observed in her opinion below, "in § 1983 actions for false arrest, probable cause need not have existed for the charge for which the plaintiff was arrested, so long as probable cause existed for arrest on a closely related charge." *Biddle v. Martin*, 992 F.2d 673, 676 (7th Cir.1993). Whatever specific disorderly conduct offense may have been cited on the criminal complaint, probable cause plainly existed here for the closely related charge of violating subsection (d).

the truck driver to approach the gate for purposes of testing the demonstrators' resolve. Cf. *Bachellar*, 397 U.S. at 571, 90 S.Ct. at 1316 (noting "petitioners' convictions could constitutionally have rested on a finding that they sat or lay across a public sidewalk with the intent of fully blocking passage along it").

 The other arguments raised by Jones in an effort to vitiate the probable cause determination are equally unavailing and merit little discussion. In brief, Jones argues that the construction activity taking place at the CTA site was unlawful because the building permit was invalid and because a Chicago noise control ordinance prohibits certain construction activities before eight o'clock in the morning. There is no reason to address the merits of these contentions, for even if Jones were correct in his assertions it would not alter our probable cause determination. The City's disorderly conduct ordinance contains no vigilante exception and there is simply no basis for Jones' position that he was somehow entitled to disregard Watson's dispersal orders and block the gate simply because he was of the opinion that unauthorized activity was taking place at the site. To the extent that Jones believes that Watson was required to investigate his contention that the contractor lacked a valid permit before Watson could arrest him, he is mistaken. This Court has consistently held that "once police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *Forman v. Richmond Police Dept.*, 104 F.3d 950, 962–63 (7th Cir. 1997) (collecting cases); see also *Kompare v. Stein*, 801 F.2d 883, 890 (7th Cir.1986) ("the police . . . have no constitutional duty to keep investigating a crime once they have established probable cause") (internal quotation marks and citations omitted). As explained above, the facts and circumstances known to Watson at the time of Jones' arrest amply supported a probable cause determination. Accordingly, further investigation was unwarranted. We further note that there is no evidence in the record that Watson entertained any doubt as to the lawfulness of the construction activity at the site, nor can we conclude that Jones' mere assertions that the construction was unlawful were sufficient to create such doubt as would require further investigation.

Having determined that Jones' arrest was supported by probable cause, we conclude that his claim under 42 U.S.C. § 1983 is defeated. *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir.1989) (noting that "the existence of probable cause for arrest is an absolute bar to a section 1983 claim for unlawful arrest"). Thus our inquiry is complete and we need not reach the issue of whether defendants are shielded from liability under the doctrine of qualified immunity.

AFFIRMED.