In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 09-3335 & 09-4079

MICHAEL MARCAVAGE, et al.,

*Plaintiffs-Appellants,*

*v.*

CITY OF CHICAGO, et al.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:06-cv-03858—**Milton I. Shadur**, *Judge.*

ARGUED NOVEMBER 4, 2010—DECIDED OCTOBER 4, 2011

Before BAUER, MANION and HAMILTON, *Circuit Judges.*

BAUER, *Circuit Judge.* The appeal before us arises from events held in connection with the seventh annual Gay Games (the "Games"), a series of athletic and cultural gatherings with the stated mission "to foster and augment the self-respect of gay men and women throughout the world and to engender respect and understanding from the non-gay world." The events took place in Chicago, Illinois during July 2006. The plaintiffs are volunteers

with the organization Repent America, a ministry of Christians whose self-described goal is "to proclaim the Gospel of Jesus Christ in the public square." In an effort to foster their mission, the plaintiffs traveled to Chicago and appeared at the Games to share their message with attendees and supporters of the Games. At three different locations during the Games, Chicago police officers ordered the plaintiffs to change the location of their outreach activities. Failure to comply resulted in the arrests of plaintiffs James Deferio and Michael Marcavage.

The plaintiffs filed a complaint in the Northern District of Illinois against the City of Chicago and individual officers of the Chicago Police Department (collectively the "City Defendants"), and against the Metropolitan Pier and Exposition Authority (the "MPEA"), a municipal corporation which owns and manages Navy Pier and Gateway Park. The complaint alleged (1) denial of their First Amendment rights to free speech and exercise of religion; (2) denial of their Fourteenth Amendment right to equal protection; and (3) denial of their rights under the Illinois Religious Freedom Restoration Act (the "IRFRA"). They later amended their complaint to add claims against the City for (1) denial of equal protection; (2) denial of their Fourth Amendment rights; (3) state-law conversion; and (4) spoilation.

Cross motions for summary judgment were filed by the City Defendants and the plaintiffs. The district court denied the plaintiffs' motion and granted the City Defendants', finding that (1) the orders issued by the police during the events at the Games were content-neutral

regulations narrowly tailored to serve the legitimate purpose of maintaining an orderly and effective flow of traffic and therefore did not violate the First Amendment; (2) the plaintiffs' Equal Protection claim failed because they could not identify any similarly-situated individuals at the Games who received more favorable treatment from the officers than they did; and (3) the plaintiffs' Fourth Amendment claims failed because their arrests were supported by probable cause. The court refused to exercise supplemental jurisdiction over the state-law claims and later granted a motion for judgment on the pleadings in favor of the MPEA, finding that the issues raised in the MPEA claims were precluded by the grant of summary judgment in favor of the City Defendants.

The plaintiffs have appealed and we affirm in part and reverse in part.

## I.  BACKGROUND

The events giving rise to the plaintiffs' claims occurred at Soldier Field on July 15, 2006, Navy Pier on July 16, 2006, and Wrigley Field on July 22, 2006. A summary of the events that transpired at each location is set forth below.

### A.  Soldier Field

July 15, 2006 marked the opening ceremonies of the Games. The plaintiffs spent approximately two hours that day demonstrating around the stadium. A large

concentration of people traveled along a broad sidewalk bordering McFetridge Drive. At one point, Deputy Chief Daniel Dugan advised the plaintiffs they were blocking the sidewalk and directed them to a gravel area adjacent to it. According to deposition testimony from the plaintiffs, during their time at Soldier Field, they preached, displayed signs and banners, and distributed Gospel tracts. However, they testified that Dugan's prohibition against standing on the sidewalk prevented them from engaging attendees in a "one-on-one presentation of the Gospel of Jesus." In the district court, the plaintiffs also contended that they experienced difficulty handing out Gospel tracts from their position on the gravel.

### B. Navy Pier and Gateway Park

The following afternoon, the plaintiffs arrived at Navy Pier to engage in similar activity. After exiting the parking garage, the plaintiffs walked west along the north side of the pier, where they encountered security personnel. The security officers told them they could not demonstrate on the pier without an MPEA permit authorizing it; the plaintiffs did not have such a permit, nor had they applied for one. Accordingly, the officers escorted them toward Gateway Park. When directed to cross the street toward the park, the plaintiffs refused and proceeded to walk along the sidewalk fronting the main entrance to the pier. After being warned to cross the street or face arrest, the plaintiffs were driven further and further from the pier, since Chicago Police Officer Adam Andrews, who responded to the

disturbance, was under the correct impression that the MPEA's Policy for Public Expression at Navy Pier and the Headlands (the "Policy") also required a permit in order to demonstrate in Gateway Park. Marcavage argued with Officer Andrews and called 911 in an effort to reach a supervising officer. He was then handcuffed and forced to sit down; James Deferio, who was carrying a video camera, and another member of the plaintiffs' group, Ryan Murphy, were both arrested and taken to the 18th precinct. Following their arrest, the remaining plaintiffs, Marcavage and Faith Deferio, along with another member of their group, Craig Scarberry, were ordered to leave Gateway Park under the threat of arrest. They complied.

### C. Wrigley Field

The closing ceremonies of the Games were held on July 22, 2006 at Wrigley Field. At approximately 1:00 p.m., the plaintiffs arrived. Marcavage proceeded to the southwest corner of the stadium. While walking east along the sidewalk on the north side of Addison Street, he held a sign in one hand and a video camera in the other. When he reached the southeast corner, he proceeded to pace back and forth along the sidewalk. At one point, he stood at the intersection of Addison and Sheffield Streets, a main thoroughfare for attendees entering the stadium. An officer told Marcavage to "keep walking," but Marcavage insisted he had a right to stand there. The officer repeated his order to cross the street many times, but Marcavage refused. He was ultimately arrested and charged with disorderly conduct.

## II. DISCUSSION

We have reviewed the district court's grant of summary judgment *de novo*[1] and conclude that summary judgment was appropriately entered in favor of the City Defendants with respect to the claims involving Soldier Field and Wrigley Field. However, with respect to the First Amendment claim involving Navy Pier and Gateway Park, we remand the case to the district court with instructions to evaluate the constitutionality of the MPEA's Policy in accordance with this opinion.

### A. Constitutional Claims Involving Soldier Field and Wrigley Field

We begin with the district court's treatment of the claims involving Soldier Field and Wrigley Field. The plaintiffs challenge the findings below on First Amendment, Equal Protection, Fourth Amendment, and qualified immunity grounds. We do not find their arguments persuasive.

We start with the First Amendment and Equal Protection claims. The plaintiffs' primary complaint is that they were not permitted to use the main pedestrian thoroughfares at each of the venues for their outreach activities during the Games. They claim they were entitled to do so under the First Amendment and that because others were using the sidewalks during the

---

[1] *See Scott v. Edinburg,* 346 F.3d 752, 755 (7th Cir. 2003).

Games, their right to equal protection under the law was violated. Both arguments are without merit.

It is true that sidewalks like the ones outside Soldier Field and Wrigley Field are traditional public forums where the exercise of First Amendment rights is often most vibrant. As the Supreme Court has described the rationale for promoting broad access to public forums, "streets, sidewalks, parks and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." *Carey v. Brown*, 447 U.S. 455, 460 (1980).

However, the fact that such rights cannot be denied "broadly and absolutely" does not mean they cannot be curtailed at all. On the contrary, the time, place, and manner of a speaker's activities can be regulated without violating the First Amendment so long as the restrictions are (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for communication. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983).

The orders given by the officers at both locations met each of these criteria. At both locations, officers instructed the plaintiffs to "keep moving" to avoid inter-

ference with pedestrian traffic at the Games.[2] When they refused, they were asked to move to alternate locations. (At Soldier Field, the officer suggested they move to a gravel area immediately adjacent to the sidewalk. At Wrigley Field, they were asked to cross the street.) At oral argument, the plaintiffs were asked to provide whatever evidence they had of the officers' hostility toward their message; none was offered. Their inability to cite to any such evidence is consistent with the record, which invariably shows that the directives given by the officers were based on the plaintiffs' offensive conduct (blocking the main thoroughfares of the Games), not their message. This shows that the restrictions were content-neutral. Since the plaintiffs do not dispute that the government maintains a significant interest in controlling pedestrian traffic,[3] their only remaining challenge is to the adequacy of the alternative venues presented for their speech. The plaintiffs argue the restrictions were overly broad; we disagree.

Though the plaintiffs do not feel the gravel area at Soldier Field and the southern side of Addison Street opposite Wrigley Field were adequate places to conduct their activities, the fact that the permissible locations were not the plaintiffs' preferred venues does not render

---

[2] Though the plaintiffs argue they were not blocking the sidewalks, their own video recordings taken at the events plainly show pedestrians walking around them while they remain stationary.

[3] *See* App. Br. at 32.

them inadequate. After all, the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647 (1981). Rather, it protects the right of every citizen to "reach the minds of willing listeners . . . [and] to do so, there must be opportunity to win their attention." *Hill v. Colorado,* 530 U.S. 703, 728 (2000). The alternate locations were within view and earshot of those traveling to the Games. We harbor no doubt that from these locations, the plaintiffs had ample opportunity to capture the attention of the Games attendees and supporters; they were only limited by their own stubborn refusal to move there. As to the plaintiffs' challenge that the restrictions were overly broad, though a regulation need not be the least restrictive means available,[4] we cannot think of a narrower way of dealing with demonstrators blocking a pedestrian walkway than to request that they continue moving or change their location to a place very nearby.

Having found that the officers' directives to keep moving or relocate were (1) content-neutral, (2) sufficiently narrowly tailored to the significant goal of avoiding congestion and maintaining an orderly flow of traffic at the Games, and (3) accommodating of the need to provide an alternative channel for the plaintiffs' speech, we find that such restrictions were compatible with the

---

[4] *See, e.g., Bl(a)ck Tea Society v. City of Boston,* 378 F.3d 8, 12 (1st Cir. 2004).

First Amendment and that the district court did not err in granting summary judgment in favor of the City Defendants on these claims.

With respect to the argument that the restrictions violated their right to Equal Protection, the plaintiffs have not identified similarly-situated individuals who received preferential treatment at the Games. Whether persons are similarly-situated is a question of fact that is appropriately resolved on summary judgment when no reasonable fact-finder could determine that the plaintiffs have met their burden on the issue. *Srail v. Village of Lisle, Illinois*, 588 F.3d 940, 945 (7th Cir. 2009). To be similarly-situated, persons must be alike "in all relevant respects." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Although the plaintiffs argue to the contrary, the attendees, supporters, and vendors allowed on the sidewalk were not similarly-situated to the plaintiffs. Games organizers contracted to hold the 2006 events in Chicago, including an opening ceremony at Soldier Field and a closing ceremony at Wrigley Field. In so doing, the events brought thousands of people to the city and the chosen venues, much like a concert or political convention would. Attendees and supporters of the Games were allowed on the sidewalks because they had a particular purpose being there, namely, to access the venues reserved for their activities and to sell souvenirs. These purposes are entirely distinguishable from the plaintiffs' efforts to disrupt the events by protesting along the main thoroughfares of the Games. We hold that a reasonable factfinder could not in good conscience find that the plaintiffs were similarly-situated to other users of the sidewalks. Since

there is no reliable evidence that there were other pro-testors who were treated differently, the district court appropriately granted summary judgment on the Equal Protection claims.

The plaintiffs' argument that Marcavage's Fourth Amendment rights were violated when he was ar-rested for disorderly conduct at Wrigley Field is equally unavailing. The plaintiffs argue that the officers at Wrigley Field lacked probable cause to arrest Marcavage, making his arrest without a warrant unreasonable and unconstitutional. Police have probable cause to arrest an individual without a warrant when "the facts and circumstances within their knowledge and of which they have reasonably trustworthy information" would make a prudent person believe the individual "had com-mitted or was committing" an offense. *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998). Under Illinois law, a person commits disorderly conduct when he knowingly does any act in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. 720 ILCS 5/26-1(a)(1). The district court found that Marcavage's obstruction of the walkway, argumentative tone toward law enforcement, and refusal to obey the lawful instructions of a police officer all gave rise to probable cause for his arrest for disorderly conduct. Since the act of blocking the free flow of pedes-trian traffic alone is sufficient to support a conviction

for the offense of disorderly conduct under Illinois law,[5] we need not spend much time on this issue. The facts are clear that Marcavage stubbornly refused to move from his position on a crowded street corner during a heavily populated event, insisting that he had a right to demonstrate there. These findings are sufficient to support probable cause for his arrest, so we affirm the district court's grant of summary judgment on the Fourth Amendment claim. Since the arrest was objectively supported by probable cause and there was no Fourth Amendment violation at Wrigley Field, we need not discuss the doctrine of qualified immunity.

### B.  Constitutional Claims Involving Navy Pier and Gateway Park

Navy Pier and Gateway Park differ from the other two venues in that the exercise of expressive activity at these venues is governed by a written policy for public expression. The Policy requires permits for expressive activity on and around the pier and the MPEA is charged with collecting and administering the permits. Although we agree with the district court's treatment of the claims dealing with Soldier Field and Wrigley Field, we believe that the Policy applied to exclude the plaintiffs from Navy Pier and Gateway Park merits further review.

This court has considered the exercise of free speech at Navy Pier and Gateway Park before. *See Chicago Acorn*

---

[5]  *See Jones v. Watson*, 106 F.3d 774, 779 (7th Cir. 1997).

*v. Metro. Pier & Exposition Auth.*, 150 F.3d 695 (7th Cir. 1998). In *Chicago Acorn,* we drew a distinction between the constitutional protections required at various venues. In particular, we held that while Navy Pier is a nonpublic forum, Gateway Park is a traditional public forum subject to heightened First Amendment protection. *Id.* at 700-04.

We are not troubled by the Policy's restrictions on speech at Navy Pier. The pier's designation as a nonpublic forum appropriately reflects its commercial nature. Though it is a recreational area open to the public, the pier itself primarily consists of event spaces, stores, restaurants, theaters, and an amusement park. Its nature is one of private enterprise with tangential public benefit; while the public can enjoy firework displays, free concerts, and views of Lake Michigan from the many benches along the pier, the revenue-generating outlets that support the pier fuel tourism and make these public benefits possible. Since the pier is a nonpublic forum, the MPEA and the City may restrict activity on the pier so long as the restrictions are reasonable and viewpoint neutral.[6] The Policy states that permits are granted on a first-come, first-served basis "without reference to the content of the message to be expressed" and may be denied for enumerated reasons,

---

[6] *See Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 800 (1985).

all of which we find to be reasonable.[7] The plaintiffs have not presented evidence that the officials at Navy Pier and Gateway Park expressed hostility toward their message. And, since they never applied for a permit to engage in their outreach activities at Navy Pier, it cannot be said that they were denied a permit because of their beliefs. Accordingly, we hold that the Policy's regulations dealing with expressive activity on Navy Pier are constitutional.

The analysis for Gateway Park is not as straightforward. Though the same corporation manages Navy Pier and Gateway Park and the same Policy governs both properties, greater opportunities for public expression must be made available to the public in the park than on the pier, since the park is a traditional public forum historically associated with such activity. As noted in the previous section, any policy restricting expressive activity in a traditional public forum such as Gateway Park must be content-neutral, narrowly tailored, and provide ample alternative channels of communication to those seeking to express their views. *See Perry*, 460 U.S. at 45. This is a more stringent standard than the "reasonable and viewpoint neutral" one that governs Navy Pier.

---

[7] Stated reasons for denying a permit application include that the proposed number of participants would cause (a) a risk of injury or damage to the pier's resources; (b) traffic congestion; (c) interference with activities for which the MPEA has granted a lease or license; (d) impairment of the operation of the pier's facilities; or (e) unreasonable danger to the health or safety of the public or the pier's visitors.

Though the extensive permitting scheme in place for the two venues seems appropriate for Navy Pier, whether the Policy is appropriate for Gateway Park is not as clear-cut.

The plaintiffs, who arrived at Navy Pier and Gateway Park in a group of five, challenge the Policy as overly broad. They dispute the Policy's requirements that (1) a group as small as five must apply for a permit to engage in expressive activity at Gateway Park at least seven days in advance; (2) persons less than five (which would apparently include an individual) must still apply for a permit, although without the advance notice requirement; and (3) individuals and groups are limited in the frequency with which they are allowed to submit applications for permits to engage in expressive activity at Gateway Park.

District Judge Shadur dismissed the plaintiffs' arguments that the Policy is overly broad by citing to *Thomas v. Chicago Park Dist.,* 534 U.S. 316 (2002). In *Thomas*, the Supreme Court upheld this court's finding that an ordinance requiring a permit for events of more than fifty people is facially constitutional. Though Judge Shadur is correct that permit requirements for the use of public parks for expressive uses are "routinely imposed," our case differs from *Thomas* in two important respects. First, it involves a group one-tenth the size of the number that would trigger a permit requirement under *Thomas.* Second, although our plaintiffs arrived in a group of five, the Policy we are asked to review would arguably require a permit for the expressive activity of just one person.

The plaintiffs cite a Ninth Circuit case for the proposi-tion that a permit requirement for expressive activity by a group as small as theirs is insufficiently narrowly tailored to withstand constitutional scrutiny when the venue is a traditional public forum:

> In public open spaces, unlike on streets and sidewalks, permit requirements serve not to promote traffic flow but only to regulate competing uses and provide notice to the municipality of the need for additional public safety and other services. Only for quite large groups are these interests implicated, so imposing permitting requirements is permissible only as to those groups.

*Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1042 (9th Cir. 2006). While it may be true that most permit requirements for expressive activity in parks are not enacted to promote efficient traffic flow, the same cannot be said of the Policy at issue here. As this court noted in its detailed look at the premises of Navy Pier and Gateway Park in the *Chicago Acorn* case, Gateway Park is a "narrow bottleneck" leading to a crowded commercial pier surrounded by water on three sides. *Chicago Acorn*, 150 F.3d at 703. The Policy states that as many as 85,000 people visit Navy Pier on a crowded day. This amount of foot traffic undoubtedly presents unique challenges at the pier's point of ingress and egress: Gateway Park. While the area devoted to public parks in the *Santa Monica* case amounted to

245 acres,[8] Gateway Park measures only 19 acres. The two venues are hardly comparable.

Though we are dubious of the Ninth Circuit's blanket presumption that the sole reason permit requirements are enacted for public open spaces is to regulate competing uses, it is worth noting that many other circuits have looked unfavorably on permit requirements for groups as small as the plaintiffs' group of five. In addition to the Ninth Circuit, the Fourth, Fifth, Sixth, and Eighth Circuits have all found permit requirements for groups of ten and under to be either unconstitutional or constitutionally suspect.[9] Such a powerful consensus cannot be ignored. Though we are inclined to agree with our sister circuits that a permit requirement is less

---

[8] *Santa Monica Food Not Bombs v. City of Santa Monica,* 450 F.3d 1022, 1026 (9th Cir. 2006).

[9] *See Knowles v. City of Waco,* 462 F.3d 430, 436 (5th Cir. 2006) (striking down a parade ordinance which could be interpreted to require a permit for the activity of as few as two people); *Cox v. City of Charleston,* 416 F.3d 281, 285 (4th Cir. 2005) (holding that "the unflinching application of [a local parade ordinance] to groups as small as two or three renders it constitutionally infirm"); *American-Arab Anti-Discrimination Comm. v. City of Dearborn,* 418 F.3d 600, 608 (6th Cir. 2005) (holding that a parade ordinance that would require a permit "for almost any imaginable procession" on the streets of Dearborn, Michigan was "hopelessly overbroad"); *Douglas v. Brownell,* 88 F.3d 1511, 1524 (8th Cir. 1996) (expressing doubt that applying a parade ordinance to a group as small as ten would be sufficiently narrowly tailored).

likely to be content-neutral and narrowly tailored when it is intended to apply even to small groups, we decline to hold that permit requirements for groups of any specified number are *per se* unconstitutional.

Only after viewing the Policy in light of the concerns that are unique to the venue in question do we believe a court can appropriately assess the constitutionality of the regulation. This is a factually driven inquiry. On the one hand, Gateway Park's location immediately adjacent to the heavily trafficked Navy Pier poses unique logistical concerns that may make the regulations necessary. On the other hand, the park's proximity to the pier makes it a natural alternative venue for the type of expression that the pier itself cannot support. Absent a greater understanding of the rationale behind the MPEA's Policy, we are left with the impression that the imposition of burdensome restrictions for small groups at Gateway Park might be overreaching.[10] Accordingly, we remand

---

[10] In *Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Recreation (H.E.R.E. v. City of New York)*, 311 F.3d 534 (2d Cir. 2002), the Second Circuit dealt with a First Amendment challenge to restrictions on organized public expression at New York's Lincoln Center, a city-owned plaza at the center of several well-known performing arts venues. Although the court upheld restrictions on such expressive activity in the central plaza of the Lincoln Center complex, it noted that, in denying permit applications for those who wished to leaflet or demonstrate on the plaza, applicants were encouraged to use a public park to the south

(continued...)

the case to the district court where the MPEA can be given an opportunity to defend its Policy.

The plaintiffs' Equal Protection and Fourth Amendment claims dealing with Navy Pier and Gateway Park require little discussion. With respect to their Equal Protection claim, the plaintiffs argue that they were treated differently than attendees of the Games; however, the attendees had a permit to use the premises and the plaintiffs did not. As to their Fourth Amendment claim, the district court appropriately found that the responding officer had probable cause to arrest Deferio and detain Marcavage, since the two unlawfully remained on the premises after being repeatedly told to leave or obtain a permit. Although the constitutionality of the Policy remains in question, the arresting officer's objectively reasonable reliance on the permit requirement in effect at the time of the arrest is sufficient to shield him from liability under the doctrine of qualified immunity.

## C. Supplemental Claims

The plaintiffs' final argument is that the district court erred in declining to exercise supplemental jurisdiction

---

[10] (...continued)
of the complex for their activities. This area, called Damrosch Park, was part of the original site plan for Lincoln Center. The use of the adjacent park at Lincoln Center as an alternate location for expressive activity is an interesting counterpoint to Gateway Park, an area which could serve as an alternate location for public expression at Navy Pier, but is instead heavily regulated under the existing Policy.

over various state-law claims. A district court's refusal to exercise supplemental jurisdiction is reviewed for abuse of discretion. *In re Repository Technologies, Inc.*, 601 F.3d 710, 724 (7th Cir. 2010). Under this standard, we will reverse a district court's decision to relinquish jurisdiction over such claims only in "extraordinary circumstances." *Id.* at 725. Since no such circumstances are present in this case, the district judge did not abuse his discretion and we affirm.

### III. CONCLUSION

For the reasons set forth above, summary judgment in favor of the City Defendants is AFFIRMED, except with respect to the First Amendment claim dealing with Gateway Park. This claim is REMANDED to the district court, where the constitutionality of the Policy shall be adjudicated with the participation of all the parties. The district court's grant of the MPEA's motion for judgment on the pleadings is hereby REVERSED, since the holding previously given preclusive effect is to be reconsidered on remand.

HAMILTON, *Circuit Judge*, dissenting in part. I agree with my colleagues that plaintiffs failed to prove violations of their constitutional rights outside Soldier Field and Wrigley Field, and on Navy Pier. I respectfully disagree with the portion of the decision that remands to the district court plaintiffs' claim that their rights were violated in Gateway Park, immediately west of Navy Pier, on July 16, 2006.

The point of my disagreement may be identified by asking what error the district court made, based on the record before it. The majority opinion does not answer that question. Instead, it expresses an impression that the application of the MPEA's permit requirements to small groups at Gateway Park "might be overreaching," but instructs the district court first to develop a record so that "the MPEA can be given an opportunity to defend its Policy." *Ante* at 18-19. The reason no such record exists yet is that the plaintiffs did not make this argument to the district court in a timely way, when the city defendants moved for summary judgment. This claim, whatever its merits, was therefore waived. See, *e.g.*, *Fednav Int'l Ltd. v. Continental Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010); *Domka v. Portage County*, 523 F.3d 776, 783 (7th Cir. 2008); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc.*, 991 F.2d 1249, 1258 (7th Cir. 1993).[1]

---

[1] At an early point in the litigation, plaintiffs advanced a related point—that distinguishing between groups of five or

(continued...)

In the abstract, there might well be problems with applying the MPEA's permit requirement for demonstrations in Gateway Park. Navy Pier is not a public forum, but Gateway Park is. The constitutional rules are different. See *Chicago Acorn v. Metropolitan Pier & Exposition Auth.*, 150 F.3d 695, 700-04 (7th Cir. 1998) (discussing these sites and noting MPEA's concession that Gateway Park is a traditional public forum). In a traditional public forum, a permit requirement applied to demonstrations by very small groups may run afoul of the Constitution. See *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 524 (D.C. Cir. 2010) (striking down regulations requiring permits to engage in expressive activities in national parks as "overbroad and not narrowly tailored" because they imposed "substantial burdens on individuals and small groups—burdens which the government has failed to justify"); *Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006) ("Other circuits have held, and we concur,

---

[1] (...continued)

more and four or fewer is "arbitrary and irrational." Dkt. No. 34, at 4-6. Because plaintiffs presented no more than a passing glimpse of their current theory to the district court, they failed to preserve it for appeal. A "skeletal" argument does not preserve a claim for appeal, "[e]specially not when" the party "presents a passel of other arguments." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). As *Fednav, Domka,* and *Lac du Flambeau Band* show, among many other cases, we should not encourage a litigation strategy of throwing every conceivable idea against a wall to see what might stick. We also should not encourage parties to overhaul and transform unsuccessful cases when they present them on appeal.

that ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest."); *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1039 (9th Cir. 2006) ("Without a provision limiting the permitting requirements to larger groups, or some other provision tailoring the regulation to events that realistically present *serious* traffic, safety, and competing use concerns . . ., a permitting ordinance is insufficiently narrowly tailored to withstand time, place, and manner scrutiny."); *American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) ("Permit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring."); *Cox v. City of Charleston*, 416 F.3d 281, 283, 285-86 (4th Cir. 2005) (invalidating ordinance barring "any person" from participating in "any parade, meeting, exhibition, assembly or procession . . . on the streets or sidewalks of the city" without a permit because the city failed to "establish[ ] why burdening such expression is necessary to facilitate its interest in keeping its streets and sidewalks safe, orderly, and accessible").

I also agree with my colleagues that we should avoid picking a number for the size of groups that cannot be required to obtain a permit. The configuration of Gateway Park as a "narrow bottleneck," see *Chicago Acorn*, 150 F.3d at 703, may enable even a very small group to block or reduce the flow of pedestrians to and from Navy Pier. That configuration may distinguish this location from those in *Santa Monica Food Not Bombs*, 450 F.3d at 1042, and

similar cases rejecting permit requirements for small groups.

The problem, as I see it, is that the constitutional question is before us not in the abstract but on a specific record of the evidence and arguments that plaintiffs chose to present in the district court. When the permit policy question arose in the district court, plaintiffs failed to make the arguments they make on appeal. In both their own motion for partial summary judgment and their memorandum opposing the city defendants' motion for summary judgment, plaintiffs chose not to challenge the constitutionality of the MPEA permit policy on the grounds they raise here. On the contrary, in opposing summary judgment for the city defendants and in an apparent attempt to bolster their contention that their arrests at Gateway Park were illegal, plaintiffs asserted: "As a matter of practice, the MPEA does not require a permit for persons wishing to engage in free speech activity in Gateway Park." Dkt. No. 152 at 21. Whatever the reasons for plaintiffs' tactical choice, the city defendants' motion for summary judgment put the constitutionality of the permit policy at issue. See Dkt. No. 140 at 7-10.

That defensive use of the policy was sufficient to require the plaintiffs to respond with any attack they wished to make upon the policy. *E.g.*, *Domka*, 523 F.3d at 783 (appellant's failure to make argument in opposing summary judgment waived theory for appeal). As best the district court could tell, plaintiffs' only attack on the policy was the broad and untenable theory that "any system that

requires a permit for public demonstrations and expressions of speech is per se violative of the First Amendment." *Marcavage v. City of Chicago*, 635 F. Supp. 2d 829, 840 (N.D. Ill. 2009) (describing plaintiffs' position in Dkt. No. 152). At no point in the district court's summary judgment proceedings did plaintiffs articulate a viable challenge to the permit policy. They certainly did not make the narrower and perhaps more meritorious arguments they make on appeal.

Only after they had lost on the city defendants' motion for summary judgment did plaintiffs attack the MPEA's permit policy. Judge Shadur understandably concluded that he had already decided the issue against them. In other words, a busy district court reasonably decided that plaintiffs were not entitled to what golfers would call a Mulligan. The court applied the doctrine of issue preclusion based on its earlier decisions in the case. Whether viewed in terms of issue preclusion, the law of the case, or waiver, I see no error in the court's handling of the issue. The district court's earlier decision is not binding on this court, but the course of proceedings in the district court shows that plaintiffs waived their challenge to the permit policy by failing to respond on that point when the city defendants moved for summary judgment. Based on the arguments and evidence presented, the district court did not err in rejecting plaintiffs' claims arising from the Gateway Park/Navy Pier events.

Even in these two separately-briefed appeals, plaintiffs' muddled approach continues. Plaintiffs have failed to

challenge the constitutionality of the permit policy in
No. 09-3335, their appeal from summary judgment for
the city and its officers. That was the decision in
which the district court actually considered the merits
of the permit policy. One would think that plaintiffs'
opening brief in that appeal would have been the place
both to raise the *Santa Monica Food Not Bombs* argument
and to explain their apparent failure to do so before the
district court. Instead, plaintiffs focused on whether
someone with authority told them on the spot that they
did not need a permit, a dispute that does not affect the
constitutionality of the policy. Only in their second
appeal have plaintiffs presented the permit policy issue
in a comprehensible form, raising at long last an argu-
ment they should have made years earlier. I would hold
the plaintiffs responsible for their own tactical decisions
and affirm the district court's judgments in all respects.

By ordering a partial remand, my colleagues have
taken a different approach regarding the MPEA's permit
policy. There are attractive reasons for doing so. That
approach gives the plaintiffs a second chance to get it
right. Depending on what the evidence shows, that
second chance might result in more robust protection
of First Amendment rights for plaintiffs and others. The
better approach, though, would be to adhere to a
more orderly litigation process. Plaintiffs had their op-
portunity to present their claim. They failed. In the
absence of clear error (indeed, any error) by the district
court, we should respect that process and its results.
We should do so by making clear that the district
court's decision and our affirmance of it do not amount

to a definitive constitutional blessing of the permit policy in Gateway Park, but are based instead on the confusing and contradictory path plaintiffs pursued in the district court. That approach would leave the door open for another party to bring a new and stronger challenge to the policy. It would also protect the district court and the defendants from the prejudice caused by plaintiffs' shifting and inconsistent prosecution of their case. I would affirm the district court's judgments in their entirety, and I respectfully dissent from the portion of the majority decision remanding the Gateway Park portion of the case.[2]

---

[2] To the extent that this Mulligan might enable plaintiffs to succeed to some degree on the Gateway Park issues and to seek a reasonable attorney fee under 42 U.S.C. § 1988, the district court can and should take into account the unusual procedural course of the case in determining what a reasonable fee would be.